# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 29, 2010 Session

## DENNIS WADE SUTTLES v. STATE OF TENNESSEE

**Criminal Court for Knox County**
**No. 72245   Mary Beth Leibowitz, Judge**

---

**No. E2008-02146-CCA-R3-PD - Filed April 29, 2011**

---

The Petitioner, Dennis Wade Suttles, appeals from the judgment of the Knox County Criminal Court denying his petition for post-conviction relief.  A Knox County Criminal Court jury convicted the Petitioner of premeditated first degree murder and sentenced him to death.  The Tennessee Supreme Court affirmed the Petitioner's conviction and sentence on direct appeal.  State v. Suttles, 30 S.W.3d 252 (Tenn.), cert. denied, 531 U.S. 967 (2000). On appeal, the Petitioner challenges the effectiveness of his counsel's representation before trial, during trial, and on direct appeal.  The Petitioner also challenges the constitutionality of the death penalty.  This court holds that the trial court did not err in finding that the Petitioner received the effective assistance of counsel at all stages of the case and that the Petitioner's challenges against the death penalty are without merit.  The judgment of the trial court denying post-conviction relief is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Paul J. Morrow, Jr., Daniel E. Kirsch, and Nicholas Hare, Nashville, Tennessee, for the appellant, Dennis Wade Suttles.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Angele M. Gregory, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leland Price, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Background

On March 13, 1996, the Petitioner killed his estranged girlfriend, Gail Rhodes, in the presence of her daughter and her daughter's friend in the parking lot of a fast food restaurant in Knoxville, Tennessee. In November 1997, the Petitioner was convicted of premeditated first degree murder and sentenced to death. The jury found two aggravating circumstances in support of the death penalty: (1) the Petitioner was previously convicted of prior violent felonies and (2) the murder was especially heinous, atrocious, and cruel. See T.C.A. § 39-13-204(i)(2) and (5) (Supp. 1996) (amended 1997, 1998, 1999, 2002, 2008, 2009, 2010). The facts of the case were summarized by our supreme court in its opinion on direct appeal:

> The proof introduced at the guilt phase of the trial showed that the defendant and the victim met and began dating in April of 1995. The relationship progressed, and in October 1995 the defendant asked the victim to marry him. The victim's divorce was not final at that time, so the engagement was delayed. In December 1995, the defendant purchased a house, and the defendant, the victim, and her fifteen-year-old daughter, Christina, moved into the house together. At Christmas, the defendant gave the victim an engagement ring.
>
> However, in February 1996, the victim moved out of the defendant's house after the two argued. Around the time of this argument, the victim's co-workers had noticed deep bruises on the victim's neck that looked like fingerprints. In his testimony, the defendant admitted that during the argument he tried to take the engagement ring from the victim's finger and broke the victim's necklace.
>
> The defendant was distraught at the breakup of the relationship. He repeatedly sought to convince the victim to return to him. He called her repeatedly at work, sometimes waited for her at work, left cards on the windshield of her car, and attempted to speak with her whenever he saw her in public.
>
> The victim appeared afraid of the defendant and tried to avoid him. She did not speak with him on the telephone when he called, and the victim's co-workers escorted her to her

2

vehicle in the evening. In addition, the victim kept secret the location of her new residence and carried important personal papers, such as a deed to her burial plot, in her purse so that the papers could be easily located should something happen to her. The victim knew that in 1986, the defendant had pled guilty to one count of felonious assault with bodily injury and three counts of assault with intent to commit first degree murder. She also knew that these convictions arose out of an incident where the defendant attempted to force his estranged former wife and his three-year-old son to return home with him. When his former father-in-law intervened, the defendant shot him. The defendant also assaulted a police officer who tried to apprehend him during this episode. The victim knew the circumstances of the previous convictions because she had accompanied the defendant on his monthly visit to his parole office on October 3, 1995. The parole officer told the victim the circumstances of the offenses and advised her to call if "anything unusual occurred."

On March 13, 1996, about one month after the break-up, the defendant, who was a foreman for a roofing company, worked his regular job. His co-workers testified that he was not angry or upset that day, did not make threatening remarks about the victim, and seemed his usual self. As he was driving home from work, he saw the victim drive by in her car with her daughter and her daughter's friend, Arlisa Tipton, but he lost her car when she drove into a residential neighborhood. The defendant then drove to his mother's house, where he was invited to eat supper. He accepted the invitation but decided that he would go to his own home first and shower and change clothes before supper. The defendant left his mother's home around 5:30 p.m., and he did not appear angry or upset at the time he left, nor did he say anything about the victim. The defendant's step-father operated a small engine repair shop and had repaired the motor in a piece of equipment, a leaf blower, that the defendant used on his roofing jobs. The defendant loaded the leaf blower in his car when he left his mother's home and said that he intended to use it on his roofing job the next day.

3

In the meantime, the victim, who had been aware that the defendant was following her and had deliberately eluded him, drove to a nearby Taco Bell restaurant to eat with Christina and Arlisa. According to Christina, the victim parked her car in the back of the restaurant so the defendant would not see the car if he drove past the front of the restaurant on Chapman Highway.

Unfortunately, on the way to his home, the defendant stopped at Wal-Mart on Chapman Highway which is located in the same shopping mall area as the Taco Bell where the victim was eating with Christina and Arlisa. The defendant intended to purchase some roofing supplies. The defendant was unable to find the products he needed, so he left Wal-Mart. As he was driving away from Wal-Mart toward Chapman Highway, he drove past the back of the Taco Bell and pulled into the restaurant when he noticed the victim's car. Parking his automobile beside the victim's vehicle, the defendant went inside the restaurant and attempted to speak with the victim. The two argued, and the defendant followed the victim and the girls outside.

The argument continued as the victim and the defendant stood beside the victim's automobile. Finally, the defendant grabbed the victim to prevent her from getting into her car. Placing one arm around the victim's neck, the defendant held a lock blade pocket knife to her throat. When Christina approached, the defendant said, "Get back or I'll kill her." Christina stepped back, and the victim told the defendant to put the knife away and she would go with him. The defendant put the knife in his pocket, apologized, and released the victim. When the victim fled toward the restaurant, the defendant followed, tackled the victim, pulled out his knife, slashed her throat and stabbed her multiple times. Christina, who witnessed the attack on her mother, testified:

> He cut her on her neck. He slit her neck all to pieces. And he stabbed her in the face and cut her lip and he cut her hair and he cut her body; he

4

stabbed her. And I saw him flip her over and he stabbed her in the back.

. . .

I was about three feet back because she kept telling me to get back and she kept screaming.

When he was finished, the defendant arose, wiped off his knife, returned it to his pocket, nonchalantly got into his car, and drove away. Christina testified that the defendant smiled at her as he drove by.

Amanda Reagan, an employee of Taco Bell, and Shawn Patrick Kane, a man who had just left the grocery store across the parking lot from Taco Bell, also witnessed the stabbing. According to these witnesses, after stabbing the victim, the defendant nonchalantly got into his car and drove away as if nothing of any great import had occurred. Both of these witnesses noticed the defendant's license plate number and gave it to police.

While they waited for an ambulance, Reagan, Kane, and an unidentified nurse, tried to help the victim as she lay helpless and bleeding in the parking lot. Attempting to stop or slow the bleeding, they applied pressure using towel and napkin compresses. The victim complained of choking and, when she tried to move, witnesses testified that the wound on her neck gaped open and she started gurgling blood. Although Kane did not hear her say anything further after she complained of choking, he said she was still trying to move when she was being loaded into the ambulance. Reagan testified that as she was holding the stretcher while the victim was being loaded onto the ambulance, she heard the victim call out her daughter's name and saw the victim stretch out her hand as she was placed in the ambulance. The victim arrived by ambulance at the hospital at 6:26 p.m. and was pronounced dead at 6:35 p.m.

Around 7 p.m., the defendant called a friend, Donna Rochat. He told Rochat that he thought he had killed the victim

5

after an argument in the parking lot of the Taco Bell. The defendant told Rochat that he had stabbed the victim in the back, cut her throat, and stabbed her in the chest. Rochat advised the defendant to surrender to police, but he said he could not do that. Rochat said the defendant seemed calm, but he commented that he would kill himself if he had a gun. The defendant also called his mother at some point after the stabbing and asked her to drive to the Taco Bell and determine if he had killed the victim.

Later that same evening, the police arrested the defendant as he approached his house on foot. The defendant had parked his car at a church parking lot about one mile from his home. The police described the defendant as cooperative and unemotional at the time he was apprehended. A knife with a wooden handle and approximately a three inch blade was found in the defendant's pocket at the time of his arrest.

Dr. Sandra K. Elkins, the Knox County Medical Examiner and a forensic pathologist, testified that the victim had suffered twelve major wounds inflicted with a sharp instrument such as a knife. These wounds included three stab wounds to the left side of her neck, a large gaping slash wound to the right neck, one stab wound just beneath her left breast, one stab wound to her left front shoulder, six stab wounds in her back. The victim also sustained an incise wound to the left side of her lips, defensive wounds to both hands and her right wrist, and superficial wounds underneath her chin. Dr. Elkins opined that the cause of death was multiple knife stab wounds. The immediate cause of death according to Dr. Elkins was bleeding from the jugular vein and external carotid artery, which were cut by the slash wound to the right neck. The other major wounds would have also potentially caused death given enough time and no medical treatment. Dr. Elkins also opined that the victim was alive when the wounds were inflicted, that she remained able to speak, because the injury to her larynx from the slash wound to the right side of her neck did not damage her vocal cords, that she would have fallen unconscious in about five to six minutes, and that she would have bled to death within ten minutes as a result of the slash wound to the right side of her neck. However,

6

Dr. Elkins opined that application of pressure to the wound on the right side of the victim's neck may have extended consciousness and delayed the time of death by five minutes.

The defendant testified at trial. According to the defendant, while he and the victim were talking beside her car, the victim told him that, if he did not stay away, she would have him killed. He then grabbed her and told her not to threaten him. While admitting that he put a knife to the victim's throat, he denied that he intended to hurt her and claimed that he was only reacting to the victim's threat. The defendant testified that, when he released the victim and apologized, she told him he was a dead man. The defendant testified he did not remember anything that happened after the victim threatened him the second time. He claimed that he did not regain his memory until weeks after the murder.

During the defendant's testimony it was revealed that he had previously pled guilty to one count of felonious assault with bodily injury and three counts of assault with intent to commit first degree murder. As previously stated, the victims of these offenses were his former father-in-law, his ex-wife, his three-year-old son, and a police officer who was attempting to apprehend him. The offenses occurred when the defendant tried to force his former wife, who had left him, to return home. The victim was aware of the defendant's prior convictions.

The defendant's stepfather testified that during the years that he had known the defendant he had never seen him angry or upset, and he described the defendant as a calm and easygoing person. Dr. Jerry Matthews, a clinical psychologist who had evaluated the defendant on three separate occasions, in 1991 and 1993 for the Tennessee Board of Paroles and in 1996 for the defense, testified about the defendant's mental condition. According to the history related to Dr. Matthews, the defendant had been a "blue baby" when he was born. His older brother died of suffocation at the age of five. His father left the family when the defendant was four, and the defendant was raised by his paternal grandparents, who were strict, religious people. The defendant dropped out of school in the tenth grade and went to

7

work.  His one marriage lasted twelve years and produced one child.

In 1991, Dr. Matthews concluded that the defendant presented a substantial risk of violent behavior if released on parole, particularly if he was involved in a heterosexual relationship.  Dr. Matthews described the defendant as someone who acts impulsively, without thought or reflection, and who, frightened of being alone, becomes anxious and potentially violent when unable to control his environment.  According to Dr. Matthews the defendant's behavior was attributable to the oxygen deprivation he suffered as a "blue baby" and to his abandonment as a child.  Between 1991 and 1993, the defendant attended anger management classes in prison.  He was released on parole in 1994.

Dr. Matthews opined that at the time of the homicide the defendant was in a state of heightened emotional arousal, that he put the knife to the victim's throat to convince her to come back to him, and that he released her when she reassured him. Accepting the defendant's version of the offense, Dr. Matthews said that the victim's threat to have the defendant killed was "the straw that broke the camel's back."  Dr. Matthews opined that the killing was not premeditated and was instead "an impulsive and explosive act of violence" caused by "basic, primitive emotions of anger and fear and hurt, all mixed together."

In rebuttal, the State recalled Christina who testified that her mother did not threaten the defendant, as he had claimed, before he stabbed her.

Based upon this proof, the jury found the defendant guilty of premeditated first degree murder.  At the sentencing phase, the State relied upon the proof presented at the guilt phase, and also offered into evidence the indictments and judgments from the defendant's four previous convictions for assault.  These showed that on January 6, 1986, in Sevier County, Tennessee, the defendant pleaded guilty to one count of felonious assault with bodily injury and enhancement for use of a firearm (sentence 30 years plus 5 years for enhancement) and to three

8

counts of assault with intent to commit first degree murder by use of a firearm (three 5-year concurrent sentences).

The defendant presented records from his earlier imprisonment in the Department of Correction to show that he had been a model inmate. For example, these records showed that at the time of his parole he received recommendations from twenty-nine staff members at the correctional center and that the warden and associate warden recommended parole. He worked during his entire imprisonment, was not violent and reached "trusty" status. During his incarceration, the defendant received two write-ups: one for having contraband (tools) in his cell and the other for violating policy and procedures by possessing a fan from which the name and inmate number had been scrubbed.

The defendant's mother, Lois Evelyn Napier, testified that the defendant was born breach and was a "blue baby." After the defendant's father left, the defendant lived with his paternal grandparents because his mother was working two jobs and could not care for him. The defendant was not involved in any trouble as a child. During his imprisonment, Mrs. Napier visited her son weekly. After his release on parole, he lived with his mother and her husband and caused no trouble. The defendant called his mother on the night of the murder and asked if she would go to the Taco Bell to see if the victim was alive. Ms. Napier testified that she loved her son very much and wanted to help him. The defendant was forty-four years old at the time of the murder.

Suttles, 30 S.W.3d at 252-59.

## Post-Conviction Proceeding

The Petitioner timely filed his petition for post-conviction relief, and the trial court appointed the Office of the Post-Conviction Defender, who filed amended petitions on the Petitioner's behalf. Following an evidentiary hearing, the trial court entered its written order denying relief.

9

## Evidentiary Hearing

Brandt Davis and Leslie M. Jeffress were appointed to represent the Petitioner at trial. Glori Shettles was the mitigation specialist. Barry Rice served as an investigator, and Julie Fenyes was the jury expert. Mr. Jeffress acted as lead counsel and handled the guilt phase of trial preparations, and Mr. Davis was in charge of mitigation. The two attorneys, however, discussed all aspects of the case, and each was aware of what the other was doing. Jeffress testified that there was not much pretrial publicity in the case and that there was no discussion about requesting a change of venue. Counsel filed numerous pretrial motions.

Mr. Jeffress disagreed with the supreme court's interpretation of premeditation, based in part upon the victim's daughter's testimony that the Petitioner put the knife in his pocket and then pulled it out again before attacking the victim. Jeffress recalled the statement given by Jackie Alvin Davis that the Petitioner did not put the knife back in his pocket after he initially brandished it. Jeffress acknowledged the statement would have contradicted the victim's daughter's testimony. Jackie Davis was not called as a witness by either side.

The defense team obtained copies of the Petitioner's school records. Mr. Jeffress testified that the Petitioner's family members suggested the Petitioner's father choked the Petitioner's brother to death, but counsel did not obtain the Petitioner's brother's death certificate. He said the Petitioner's mother had no independent knowledge that her husband killed their son. He said the Petitioner's father threatened the Petitioner's mother with a knife when she tried to leave the home with the Petitioner. Counsel learned that the Petitioner's grandparents, Noah and Dicie Suttles, raised the Petitioner because his mother was financially unable to do so. During cross-examination, Jeffress testified that he learned about an incident when the Petitioner also may have been choked by one of his parents but that he did not believe the incident was relevant or would have affected the jury's verdict. The Petitioner never indicated to counsel that he had been sexually abused.

Mr. Jeffress testified that the Petitioner was prescribed Paxil, Tranzene, and Pepcid some time before the murder. Counsel asked their expert, Dr. Ben Bursten, if those drugs could have affected the Petitioner's behavior or conduct at the time of the crime, but he assured them otherwise. He said that the Petitioner complained of experiencing headaches while driving around after committing the crime and that the Petitioner did not believe the victim was dead, even after he was shown autopsy photographs. The Petitioner told Jeffress he would kill himself if he thought she were dead. Based upon this disbelief, the Petitioner was evaluated to determine whether he suffered from any organic brain damage. The Petitioner underwent a sleep-deprived electroencephalogram (EEG), but the results did not reveal any brain damage. According to Jeffress, Dr. Matthews suggested administering the EEG and informed counsel that the test would determine the existence of any brain damage.

10

Counsel did not request a positron emission test (PET), a magnetic residence imaging (MRI), or a computerized axial tomography (CAT) scan. The Petitioner was not evaluated by a neuropsychologist. Counsel relied upon the advice of Dr. Matthews as their expert in this field.

Mr. Jeffress testified that he was aware the Petitioner scored an IQ of sixty-nine and seventy-eight on two Beta II tests. Counsel did not investigate, however, whether the Petitioner was mentally retarded because Jeffress saw no signs suggesting that he was. Jeffress testified that because there were "abundant indications" the Petitioner was not mentally retarded, they determined an evaluation was unnecessary. Counsel interviewed the Petitioner's employer and co-workers but found nothing to warrant further investigation. Jeffress testified:

> [The Petitioner] was foreman on a roofing job. He handled time cards, apparently, for the people he was supervisor of. He handled their money. He went and got lunch for them. He was planning to go into a business with a Danny Kagely who testified at the trial. Mr. Kagely and [the Petitioner] had prepared business cards. There was no reason to believe that he was, in fact, mentally retarded. Dr. Matthews also said that he mentioned the fact that there was this 69 score back in 1986 while he was at the penitentiary, I believe. And he said he believed that that might be an academic score but that his emotional and . . . But in any event he thought that he was not mentally retarded with regard to his ability to interact with people – with other people and with regard to how he would comport himself.

Mr. Jeffress testified that the defense strategy was to explain to the jury that the Petitioner did not act with premeditation but instead "exploded" when he committed the murder. The defense initially hired Dr. Ben Bursten, a psychiatrist and licensed psychological examiner, to serve as their mental health expert. However, according to counsel, after Dr. Bursten interviewed the Petitioner at the prison for the first time, he refused to continue working on the case because he perceived the Petitioner to be a liar and malingerer. Counsel learned about Dr. Matthews because Dr. Matthews had evaluated the Petitioner while he was previously incarcerated. Jeffress testified regarding why they chose to employ Dr. Matthews:

> Because he knew Dennis; because he knew how Dennis might react; because he had found that to be true in 1991;

11

> because he was able to tell us without any question that Dennis could not have premeditated this killing. He . . . had evaluated him twice before. The 1997 evaluation was an effort to do a check to see if his original conclusions had been correct. He was . . . able to support our theory of the case, theory of defense.

Jeffress considered Dr. Matthews to be a strong witness for the defense. Dr. Matthews had testified in three other death penalty cases. In two of those cases, he testified for the prosecution, and Jeffress thought that fact would impart more credibility in the eyes of the jury. Counsel asked Dr. Matthews to assess the psychological, emotional, and behavioral processes of the Petitioner as they related to the first degree murder charge, offer an opinion about the Petitioner's ability to maintain effective emotional and behavioral control under stress, and offer an opinion regarding whether the Petitioner blacked out after the killing as the Petitioner claimed. Dr. Matthews informed counsel that he would also follow up on his earlier evaluations. According to Jeffress, Dr. Matthews "told us what he thought was – was a good idea, and we accepted that." Jeffress said he researched what types of psychological tests might be helpful for the defense.

Mr. Jeffress testified that in 1991, Dr. Matthews's opinion was that the Petitioner was potentially dangerous and, depending on the circumstances, could "explode." Dr. Matthews did not recommend the Petitioner for parole at that time and advised a course of treatment for anger management. In addition to other positive recommendations, however, the Petitioner's former father-in-law, the victim of the prior crime, recommended that the Petitioner be granted parole. After the Petitioner completed his anger management treatment in prison, Dr. Matthews did not have the same reservations about the Petitioner's release on parole. Dr. Matthews recommended, though, that the Petitioner continue with anger management treatment after his release.

Mr. Jeffress testified that he first learned the night before the Petitioner testified of the Petitioner's claim that the victim threatened his life in the Taco Bell parking lot. Jeffress immediately informed Dr. Matthews about the matter.

Mr. Jeffress testified that he had employed Glori Shettles, a mitigation specialist, in the past and that he instructed her in this case to "do her usual job, and her usual job was very thorough." Jeffress said he gave her general instructions and relied upon her proven expertise to gather any relevant information. Ms. Shettles was hired for the purpose of preparing for mitigation in the event the trial moved to a sentencing phase. Jeffress anticipated that Shettles would thoroughly investigate the Petitioner's background, obtain relevant records, and interview relevant witnesses. As far as Jeffress was concerned, Shettles

12

"delivered very well" and did "an excellent job." Jeffress acknowledged that the Petitioner was not very forthcoming with information.

Mr. Jeffress testified that he attempted to interview the victim's daughter before trial but that she refused to speak to him. He said he interviewed Shawn Patrick Kane and Jackie Alvin Davis. He said Jackie Davis told him that he looked into the Petitioner's eyes after the attack and that the Petitioner seemed "sad as if he had done what he had to do." He said Jackie Davis also told him that he did not feel threatened by the Petitioner at that point. Jeffress said that he interviewed Amanda Reagan before trial but was surprised when Ms. Reagan testified that she heard the victim call for her daughter when she was being placed in the ambulance. He said that he did not voice an objection. He said Jackie Davis was not called as a witness.

Mr. Jeffress testified that he called Gwen Stargil, the Petitioner's parole officer, to testify at trial in order to show the jury the victim was not afraid of the Petitioner. According to Ms. Stargil, the victim never voiced a complaint about the Petitioner's behavior. When asked whether he was concerned about opening the door to the circumstances of the Petitioner's prior offenses, Jeffress responded:

> It didn't make any difference. We were going to use Jerry Matthews anyway, and it would come in that way. And Dennis had already told [the jury] about it anyway so – We just had to let it all, if you will, hang out. We really did because we thought that the best thing to do would be to let the jury know these things because it would indicate that . . . he was a . . . mad man at times and that this was a – another incidence of the same thing, same type of conduct that would suggest that he did not – did not plan or did not premeditate this crime.

Similarly, Jeffress testified that he did not believe using Dr. Matthews as their expert would hurt their case because the Petitioner's prior criminal conduct and Dr. Matthews's involvement were tied to their defense theory that the Petitioner fell into a violent rage after being rejected by the victim. Jeffress acknowledged that Dr. Matthews did not find a mental disease or defect such as intermittent explosive disorder. Jeffress nevertheless argued to the jury that the Petitioner acted like a "mad man" when he killed the victim. Jeffress said that he did not intend to suggest the Petitioner was suffering from a mental disease or defect, but rather that he was in a rage, acting totally out of control.

According to Mr. Jeffress, counsel made a tactical decision not to try to exclude from evidence the knife found on the Petitioner after his arrest. The Petitioner normally carried

13

a pocket knife with him, and counsel believed that fact tended to suggest the Petitioner did not arrive at the Taco Bell with the intent to kill the victim. The knife at issue was relatively small, and counsel believed that if the Petitioner intended to kill the victim, he would have armed himself with a more lethal weapon.

Mr. Jeffress advised the Petitioner not to testify. The Petitioner, however, decided in the middle of the trial to testify, and even with such short notice, counsel did their best to prepare him. The State made an offer of life without parole, and Jeffress, as well as Ms. Shettles and the Petitioner's mother, advised the Petitioner to accept the offer.

Regarding the allegation that counsel failed to cross-examine Donna Rochat effectively, Mr. Jeffress testified he "wanted to get that woman off the stand as soon as possible." The Petitioner confided in Ms. Rochat about his relationship with the victim, but Ms. Rochat apparently requested protection from the Petitioner after the murder. Because her testimony was detrimental to the defense, Jeffress did not want to prolong her presence on the stand. Similarly, Jeffress did not want to engage in extensive cross-examination with the victim's daughter because he was afraid she would portray the Petitioner as being much worse than he was.

Mr. Jeffress testified about the defense theory during sentencing:

> That's hard to say as to what the theory might have been. Mr. Suttles was 45 years old, I think, at the time, and we couldn't use the usual defense of mitigation of poor Mr. Suttles. He's on drugs; he's on – he's been – had a bad childhood, that sort of thing. He was 45 years old and had been around. We didn't think the jury would – would listen to that, and certainly they didn't in another case that I had.
>
> I thought that Mr. Davis . . . was expecting to put on some idea that . . . Mr. Suttles would do well in prison, that he had done well in prison, that he had amassed all of these people who would favor his release. I believe he did . . . not have any kind of a major write-up while he was in prison. He did very well in a controlled environment, and that there was no reason to kill him.

Because of the Petitioner's age, Mr. Jeffress did not believe there was any reason to inform the jury of the circumstances of his childhood because he did not think the jury would be persuaded. He stated that much of their mitigation had already been presented during the

14

guilt phase. He said they introduced the Petitioner's prison records to demonstrate his model behavior in prison even though those records contained some information that might not have been favorable. Counsel wanted to show the jury that if they spared the Petitioner's life, he could function well in a controlled environment. Part of the records introduced during sentencing included the presentence report from the Petitioner's prior convictions, in which his ex-wife stated that the Petitioner tried to kill her, that she feared the Petitioner's violent temper, and that the Petitioner threatened to kill their son if she left him. Also included in those records were statements by officers involved in the previous case suggesting that the Petitioner was a violent man who posed a future danger. Jeffress did not know why that information was not redacted.

Mr. Jeffress testified that he did not see a reason to object to the State's introduction during sentencing of the indictments of the Petitioner's prior offenses. He did not see a reason to challenge the trial court's ruling that Warden Sexton could not rate the Petitioner's prison behavior on a scale of one to ten. Nor did Jeffress offer a reason why counsel did not challenge the trial court's ruling that Warden Sexton could not testify whether it was easier to manage older versus younger prisoners. Similarly, Jeffress did not see a reason to challenge the trial court's ruling that Warden Sexton was not allowed to describe an average day of an inmate at his prison. Jeffress did not know why they did not challenge the State's objection to the Petitioner's mother's testimony about the Petitioner's remorse. Jeffress said the trial court overruled his objection during voir dire to the State's suggestion that the jury had the "duty" to return the death penalty if they found the aggravators outweighed the mitigators. Accordingly, he did not voice a similar objection when the State made a similar suggestion during closing argument.

Brandt W. Davis testified that he handled most of the mitigation work. He was aware of the Beta II IQ test that reflected the Petitioner's score of sixty-nine, but he said he "left that up to the psychologist." Davis said he spoke with the Petitioner's mother and stepfather before trial, but he recalled experiencing difficulty locating other family members willing to talk to the defense. He relied upon Ms. Shettles's investigation to produce other available witnesses. Davis said he and Shettles met about thirteen times before trial.

Mr. Davis testified that he was aware the Petitioner was a "blue baby" at birth, and he recalled that both their psychological expert and Ms. Shettles did not believe that fact was very significant. Davis knew the Petitioner's father had little involvement in the Petitioner's childhood. Before the trial, Davis asked Dr. Valerie Gruber, one of Davis's relatives, to review Dr. Matthews's report and explain to Davis the meaning of intermittent explosive disorder. He said that Dr. Gruber concluded the report did not support a diagnosis of that disorder but that she otherwise agreed with Dr. Matthews's conclusions. He said he and Jeffress did not discuss having the Petitioner submit to a full battery of neuropsychological

15

tests. He recalled that the Petitioner was given an EEG before trial but that the results did not reveal any brain injury. Davis said the Petitioner denied ever having significant head trauma. Davis did not think the Petitioner showed signs of mental retardation. Davis reiterated Mr. Jeffress's testimony regarding the Petitioner's ability to maintain a responsible job. Davis said that counsel looked into possible side effects of the prescription drugs the Petitioner allegedly took before the murder but that they were informed that none would have caused the Petitioner to act the way he did.

Mr. Davis testified that counsel strongly encouraged the Petitioner to accept a plea offer. He said the Petitioner seemed to have a hard time accepting that the victim died as a result of his attack. He did not believe, though, that the Petitioner sincerely thought the victim was still alive. Davis agreed to use Dr. Matthews as their expert because Dr. Matthews was familiar with the Petitioner and believed the Petitioner did not act with premeditation, which was what counsel was looking for in an expert. Even though Dr. Matthews recommended the Petitioner for parole, Davis did not have any issue with him testifying on the Petitioner's behalf because Dr. Matthews refused to recommend parole on an earlier date. Davis had previous experience with Dr. Bursten. He said he met with Dr. Bursten about ten times. He said Dr. Bursten informed counsel he was no longer able to assist them because he believed the Petitioner was lying and malingering. Davis said Dr. Bursten terminated their relationship.

Mr. Davis testified that the defense goal during sentencing was to rely on Dr. Matthews's guilt phase testimony, portray the Petitioner as a generally nonviolent person, and show the jury how well he adapted to prison life. Davis recalled the testimony of Warden Sexton. He did not see any reason, though, to request a bench conference when the trial judge sustained the State's objections to certain questions regarding the Petitioner's behavior and prison life in general. Because he knew before he questioned the Petitioner's mother that she would give an ambiguous answer about whether the Petitioner expressed remorse, he did not prolong a challenge to the State's objection to the question.

Mr. Davis testified that he introduced the Petitioner's prison records to show the jury how well he behaved in prison. Even though some of the information in the records was not favorable, he thought the good aspects outweighed the bad. The overall tenor of the prison records supported the defense position that the Petitioner could spend the rest of his life in prison and conduct himself appropriately. Davis believed the records presented ninety percent favorable information compared to only ten percent unfavorable information. The Petitioner received numerous letters of recommendation in prison as well as support from several prison guards when he sought parole. Davis testified: "I've been doing this a long time and I've never seen a series of prison records as complimentary to what a man was and is."

16

Mr. Davis testified that he did not believe anything was wrong with introducing evidence regarding the Petitioner's recommendations for parole, even though the Petitioner committed this crime while on parole. He believed the information was relevant mitigation. Although some information was in the records about drug use, he said there was no direct testimony that the Petitioner had a drug problem. Davis did not see a problem with any additional facts introduced in the presentence report from the previous case because information surrounding the Petitioner's prior convictions was already before the jury. He said he did not investigate a 1982 sexual assault charge because it was later dismissed, nor did he investigate an allegation that the Petitioner struck one of his teachers. Davis did not have a problem with the knife coming into evidence because the Petitioner always carried a pocketknife, which supported their theory that he did not act with premeditation.

Mr. Davis admitted that after the jury returned with a guilty verdict of first degree murder, the defense in sentencing was going to be an uphill battle because of the prior convictions and the circumstances of this offense in that the victim was stabbed to death in front of her daughter. When questioned why he told the jury during closing argument, "Why he did it, we will never know," Davis responded:

> You know, at that point I think you're trying to establish some credibility with that jury. And really, the way Dennis testified left them not really knowing. And I think other than Dr. Matthews' testimony that Dennis wasn't capable of premeditation, I don't think anybody in the courtroom ever really knew why it happened the way it did.

When asked if the Petitioner's childhood and upbringing could help explain his actions, Davis replied: "No, Mr. Suttles was 45 years old. I don't think there's anything in his childhood that a criminal jury would buy for one minute that would excuse this or would explain it."

Mr. Davis testified that the Petitioner was a good client. Davis denied as ridiculous the allegation that trial counsel never established a relationship of trust with the Petitioner. The only aspect of the case in which Davis felt the Petitioner did not adequately assist counsel was the Petitioner's inability to relate to them what happened during and right after the murder. Davis estimated he met with the Petitioner twenty-two times for a total of about thirty-eight hours during a little over one year.

Glori Shettles, the mitigation specialist chosen by trial counsel in this case, testified that she was asked to investigate the Petitioner's background and prepare a report for use in the sentencing phase of trial. She had worked with both defense attorneys in the past. She

explained her background and role as a mitigation specialist. Shettles said information about the Petitioner's childhood represented the basis of who he was as an adult. Shettles was based in Memphis and did not frequently travel to East Tennessee while working on this case. Instead, she relied upon telephone calls to gather information.

Ms. Shettles testified that she first interviewed the Petitioner in October 1996. She learned the Petitioner's older brother died at age five. She also learned that the Petitioner lived with his grandparents but that no one in the family discussed why. She said the Petitioner took more than the prescribed dosage of his medication before committing the murder. The Petitioner also informed her that he was forgetting things around that time. Shettles said the defense team attempted to locate a neuropharmacologist. Shettles investigated possible side effects of the Petitioner's prescription drugs and passed along her findings to counsel.

Ms. Shettles testified that the Petitioner did not know whether he actually killed the victim. Based upon his disbelief about the victim's death, she believed something was wrong with the Petitioner's thought process. She did not, though, think the Petitioner was lying. During cross-examination, Shettles testified that she later learned trial counsel obtained information suggesting that the Petitioner remembered more than he told her.

Ms. Shettles testified that the only family members she interviewed were the Petitioner's mother and stepfather. The Petitioner's mother told her that finances were the primary reason the Petitioner lived with his grandparents. She also told Shettles that the Petitioner was happy living with his grandparents and that the Petitioner's stepfather was kind to the Petitioner. When asked why she did not interview other family members, Shettles answered:

> There . . . was . . . a concern early on that Mr. Suttles' case should be – he should plead guilty. He was going to be given the opportunity to plead guilty, and that that was in his best interest. And even though normally the mitigation investigation, as I told you, goes outwardly, in this particular case it continued to go in. It – it – other than the records, which might be used to help the experts, there was – there was no one else that I spoke – very few people that I spoke to. And, certainly, I believe that the attorneys cared about Mr. Suttles and did not want him to get the death penalty. And they felt that he would likely be convicted, and they wanted to use all the resources to try to convince him to plead guilty to save his life. And so the mitigation investigation never went outward. It – it

18

never did from the very beginning. And that was the direction and that was the strategy, and that's where it stayed.

Ms. Shettles testified that her contact with Mr. Davis was very limited. According to Shettles, she only met with Davis two or three times, and during those meetings, they discussed how to convince the Petitioner to plead guilty rather than the mitigation evidence. She said she was asked by counsel to try to persuade the Petitioner to plead guilty. She did not think trial counsel presented much mitigating evidence during sentencing. She said that the Petitioner's prison records were favorable, though, and that she understood counsel was going to demonstrate the Petitioner's good behavior in prison. She acknowledged counsel made the ultimate decision about trial strategy and what evidence to introduce.

Ms. Shettles testified that she obtained the Petitioner's prison records, which reflected two Beta II IQ test scores of sixty-nine and seventy-eight. Although requested to do so, she could not find any documentation that the Petitioner scored below seventy on an IQ test before his eighteenth birthday. She said she understood the difference between medical neurological testing and neuropsychological testing. She remembered that she discussed neuropsychological testing with trial counsel but that the testing was not performed. She remembered trial counsel decided to use Dr. Matthews because of his knowledge of the Petitioner and his opinion that the Petitioner did not premeditate the murder. She said that, according to counsel, those benefits outweighed any harm associated with Dr. Matthews's eventual recommendation for parole. Shettles was asked by trial counsel to locate a hypnotist, but she learned that hypnosis would not help someone recall missing memories. As a result, a hypnotist was not employed.

Ms. Shettles testified that Mr. Jeffress seemed frustrated with the case. Shettles thought Jeffress was concerned the Petitioner was not being truthful with them. During cross-examination, Shettles acknowledged she informed the Petitioner that if he testified, the circumstances of his prior offenses would be known to the jury. She also told him that if he were found guilty of second degree murder, he would still spend the rest of his life in prison because of his record.

Dr. Pamela Auble, a clinical neuropsychologist, testified as an expert for the Petitioner during the post-conviction hearing. Dr. Auble performed a neuropsychological evaluation on the Petitioner, which entailed interviewing the Petitioner, performing standardized tests, and reviewing the Petitioner's medical records. Dr. Auble determined that the Petitioner was not malingering. The Petitioner's impairment index score on the Halstead-Reitan Neuropsychological Test Battery was a 0.9, which was in the fifth percentile. The index, which ranged from zero (good) to 1.0 (bad), was comprised of several tests. The Category Test measured the Petitioner's mental flexibility and ability to go back and forth between

19

different ideas. The Petitioner performed poorly on that test. The Tactual Performance Test involved putting blocks into a board while blindfolded. The Petitioner's performance on that test was also considered slow. The Speech-sounds Perception Test required the Petitioner to identify nonsensical syllables while listening to an audiotape. The Petitioner's performance on that test was also poor.

Dr. Auble testified that she also administered a Wechsler Memory Scale III test, which evaluated the Petitioner's learning and memory. She said the Petitioner performed well remembering information that had meaning to him as well as common-sense information. Conversely, the Petitioner had difficulty remembering things that did not make sense to him or that did not have any meaning to him. She also administered a Wechsler Adult Intelligence Scale III test, which she said was the "gold standard" of IQ tests. The Petitioner's full scale IQ was seventy-seven. He scored seventy-seven on the verbal portion of the test and eighty-one on the performance or non-verbal portion. She said the Petitioner's full scale score was in the sixth percentile for a person his age. Dr. Auble also administered two academic performance tests on which the Petitioner scored very low. The Petitioner read at a third-grade level, spelled at a second-grade level, and performed math skills at a fifth-grade level.

Dr. Auble testified that she also administered the Delis-Kaplan Executive Functioning System test, which measured the Petitioner's conceptual thinking and mental flexibility. The Petitioner consistently performed poorly on verbal tasks that required conceptual or abstract thinking. According to Dr. Auble, the Petitioner is a concrete or literal thinker, which meant he processed information very simply, reacted to what was before him at the moment, and did not put things together well. She said that emotional stress caused deterioration in almost any kind of functioning and that any kind of brain damage, such as that related to loss of oxygen or head trauma, would also result in dysfunction. She said that because the Petitioner was a "blue baby," he likely had a loss of oxygen that, depending on the duration, could have caused brain damage.

Dr. Auble testified that the Petitioner's high score on the Luria-Nebraska Neuropsychological Screening Test, administered by Dr. Bursten, should have led to the administration of the full Luria-Nebraska test battery to ascertain the presence of brain damage, but the battery was not done in this case. Dr. Auble said, however, that Dr. Bursten's knowledge of the Petitioner's sixty-nine IQ test score may have suggested to him that the Petitioner's score on the Luria-Nebraska screening test was not abnormal. Nevertheless, even with knowledge of the Petitioner's higher seventy-eight IQ score, Dr. Auble said she would have administered the full Luria-Nebraska battery. According to Dr. Auble's review of Dr. Matthews's evaluations, Dr. Matthews performed a personality test but did not perform any neuropsychological tests.

20

Dr. Auble testified that the Petitioner performed reasonably well on some tests requiring quick responses that did not require thought. The Petitioner's manual dexterity and coordination were normal. Dr. Auble said the Petitioner cooperated with her during all the testing.

Dr. Auble testified that the Petitioner's test score deficiencies implied that the Petitioner would have difficulty in a relationship with a loved one

> because relationships tend to be complex. You have to be able to link together information to figure out what's going on with the other person. You have to know what impact your – your behavior has on someone. You have to figure out how to make things better in relationships or worse, depending on your motivation. And all that is very complex; it's not laid out; it's not clear. And I think Mr. Suttles has a lot of difficulty in those areas.
>
> . . .
>
> [I] think he reacts in ways that result in the other person being hurt and then he really doesn't understand what he did that made it work out that way and how to fix it.
>
> . . .
>
> It's most true with women because he craves close relationships with women, and he looks for those relationships or he did in the past at any rate.

Dr. Auble suggested that the Petitioner, in an effort to repair his relationships, would tend to overwhelm a woman in his pursuits and ultimately act impulsively toward her.

Although Dr. Auble testified that an EEG would not necessarily reveal the type of neuropsychological deficits the Petitioner had, she acknowledged that the test would reveal brain injury. Dr. Auble testified on cross-examination that the Petitioner was not mentally retarded as defined by Tennessee's death penalty statute. Although she believed her evaluation of the Petitioner suggested the existence of brain damage, she was not able to identify any brain damage.

21

Dr. Peter Irvin Brown, a licensed psychiatrist, testified as an expert for the Petitioner at the post-conviction hearing. Dr. Brown interviewed the Petitioner on two separate occasions for approximately five hours. He said the Petitioner could have suffered long-term and permanent brain damage as a result of his breech birth. He recalled the Petitioner's chaotic childhood and upbringing. The Petitioner could not explain to Dr. Brown why his parents were not present during much of his youth except to say that "they just didn't seem to want me." He said the Petitioner became depressed and anxious as a result of being abandoned by his parents.

Dr. Brown testified that there was a strong presumption that based on the stories of abuse of the other children in the extended family, the Petitioner was sexually abused as well, but he admitted no definitive evidence existed. According to Dr. Brown, the Petitioner's grandmother spoiled him either to compensate for the sexual abuse he endured or as a bribe to keep him quiet about the abuse. He said, though, the Petitioner did not say he had been abused. He said the chaotic environment in which the Petitioner was raised caused him to experience difficulty later in life managing his anxiety in relationships.

Dr. Brown testified that the Petitioner's failure in school could be attributed to his intellectual or cognitive abilities or the developmental problems associated with his chaotic upbringing and that the failure resulted in the Petitioner developing low self-esteem. After the Petitioner quit school and began working, he functioned well in structured situations where he had clear supervision. Dr. Brown said the Petitioner's marriage at the age of seventeen began well. As difficulties in the marriage developed, however, the Petitioner was without coping skills and was unable to deal with the problems. Dr. Brown stated that the incident with the Petitioner's ex-wife that led to the Petitioner's prior incarceration was indicative of "a recurrent pattern in his early development of exposure to separations that end badly and are associated with threats of violence or experiences of violence."

Dr. Brown testified that the Petitioner's IQ was borderline mental retardation. He acknowledged, though, that the Petitioner did not meet the legal definition for mental retardation. He said the Petitioner's IQ, combined with various other brain deficits, significantly impaired the Petitioner's ability to handle situations in his relationships. He acknowledged the Petitioner's model behavior in prison and said he reviewed the two evaluations Dr. Matthews conducted in 1991 and 1993 while the Petitioner was in prison. The Petitioner informed Dr. Brown that the anger management classes he was required to attend at Dr. Matthews's recommendation were a "joke." Dr. Brown understood the Petitioner's description to mean the Petitioner did not understand the purpose of the classes. The treatment the Petitioner received after his release from prison "completely abandoned the awareness that Mr. Suttles has many more difficulties than he's able to articulate and

often has more difficulties than he's aware of. So the therapist relied extensively on [the Petitioner's] report that he was doing fine."

Dr. Brown testified that the Petitioner met the victim shortly after the Petitioner's previous girlfriend died of cancer and that the Petitioner dealt with the loss of one relationship by "plunging into another almost instantly." He said the Petitioner's relationship with the victim progressed too quickly, as is often the case with individuals who are immature. The Petitioner told Dr. Brown that despite his good performance, he did not like the responsibility he had as a supervisor with his roofing job. He said the Petitioner functioned better in a calm environment versus a stressful one.

Dr. Brown testified that the Petitioner reacted extremely adversely to the effects of Paxil, which is part of the Prozac family of drugs. He said that the Petitioner experienced an uncontrollable intense motor restlessness after ingesting Paxil and that the Petitioner would have been extremely anxious and would have felt like "jumping out of his skin." He said reports in the medical community also suggested that persons taking Paxil could become agitated and violent. He said literature regarding the side effects of Paxil existed at the time of the trial in this case. He said that the side effects of Tranzene, which is part of the Valium family of drugs, were more sedative in nature and that the potential risk with Tranzene was that the person might lose his inhibitions.

Dr. Brown testified that the Petitioner's chasing the victim after she fled from him in the parking lot demonstrated the Petitioner's "ability to inhibit his behavior, his ability to control or regulate his behavior, was – was at that moment nonexistent." He said the effects of prescription drugs would have contributed to the Petitioner's inability to stop his attack once he started. He stated that the Petitioner was in a state of intense emotional distress at the time of the attack but that afterwards, the Petitioner would have been emotionally exhausted. He said there was no indication the Petitioner was taking Paxil or Tranzene when he committed his prior crimes.

Dr. Brown testified that he reviewed the medical and other records of some of the Petitioner's family members and concluded that they had a significantly higher risk of anxiety, depression, and drug and alcohol abuse than the general population. Dr. Brown also observed a history of mental retardation and other psychiatric problems in the Petitioner's extended family. Dr. Brown said families contribute both their genes and their behavior to their offspring.

Dr. Brown testified that he diagnosed a cognitive disorder, a major depressive disorder, and a medication-induced disorder, as well as possible post-traumatic stress disorder and a delusional disorder. Because he determined that the cognitive and medication-

induced disorders were present at the time of the offense, he concluded the Petitioner was unable to premeditate his actions. Further, Dr. Brown said the Petitioner reacted to his overwhelming anxiety rather than acting with any sort of premeditation. He acknowledged that he was using the term "premeditation" as a medical doctor, not a lawyer. He also stated the Petitioner's behavior after the murder was extremely disorganized.

Dr. Brown testified that trial counsel should not have relied upon the services of Dr. Matthews because he had a conflict of interest based upon his previous contact with the Petitioner. The different purposes for Dr. Matthews's evaluations represented the conflict, according to Dr. Brown. He also said Dr. Matthews's evaluation was inadequate due to the lack of standardized testing.

On cross-examination, Dr. Brown testified that the Petitioner did not meet the criteria for an intermittent explosive disorder diagnosis, nor did he meet the criteria for anti-social personality disorder. He said he did not believe the Petitioner was untruthful during their interviews, but he could not explain why the Petitioner believed the victim was still alive: "I see it as a clinical piece that's unresolved." He suggested the Petitioner had unresolved bereavement issues. Dr. Brown acknowledged no MRI, CAT, or PET scans existed that revealed any brain damage. He said the Petitioner did not remember witnessing any acts of violence between his parents. The Petitioner described his grandmother as strict but loving.

Dr. Ben Bursten, a licensed psychiatrist and psychologist, was initially retained by trial counsel to evaluate the Petitioner's mental state at the time of the crime. Dr. Bursten testified that trial counsel provided him with some of the Petitioner's medical and other records before the evaluation. Dr. Bursten performed the Rey Test to determine whether the Petitioner was malingering. The Petitioner passed that test, meaning he did not show signs of malingering. Dr. Bursten also performed the Luria-Nebraska Screening Test to determine whether the Petitioner had any neuropsychological problems. The results of that screening test did not lead Dr. Bursten to perform any further clinical testing with regard to the Petitioner's brain, even though he had a report that the Petitioner scored a sixty-nine on an IQ test.

Dr. Bursten testified that during their interview, the Petitioner could not recall everything that happened on the day of the murder. Dr. Bursten did not remember telling trial counsel he thought the Petitioner was malingering. During cross-examination, however, Dr. Bursten testified that he did not remember the Petitioner and that he had no independent memory of testing him. He stated his testimony on direct examination during the hearing was based upon information contained in his records. Dr. Bursten did not remember why his services were terminated in the case.

Donnie Dykes testified that she and the Petitioner attended school together and were in the same eighth-grade English class. Ms. Dykes did not recall an incident involving an attack on their teacher by one of the students. Swanita Mynatt taught at the high school the Petitioner attended, but she testified that she could not recall an incident involving an attack by a student on a teacher while the Petitioner attended school. William Robert Rogers, the principal at the Petitioner's high school, also testified that he did not remember any such incident. Mr. Rogers confirmed that the Petitioner was suspended from school at one point for using bad language.

Edith Ruth Latham, the Petitioner's first cousin, testified that the Suttles family was very poor and that the family name was not respected. She said her half-brother shot and killed his father because his father physically abused his mother. Ms. Latham's father bore two children with her half-sister even though he remained married to Ms. Latham's mother. Ms. Latham's father "loved [the Petitioner] like a son." Ms. Latham described an incident before she was born when someone left the infant Petitioner alone in her father's car. Her father took the Petitioner to their grandparents, who raised the Petitioner. Ms. Latham remembered hearing that the Petitioner's brother suffocated after falling out of bed, but she did not remember the cause of death being intentional. She said the Petitioner's mother was quite promiscuous.

Ms. Latham testified that the Petitioner's father "just wasn't all upstairs" and would often brag about his handgun. She said her half-brothers told her their grandfather, Noah Suttles, forced them to perform oral sex on him. She said the young girls in the family were not allowed to visit Noah Suttles unless their grandmother was present. She said Noah Suttles exposed himself to one of her half-sisters. She said that her grandparents spoiled the Petitioner and that he "had a pretty free life." The Petitioner treated Ms. Latham's children well. She said that she met the victim once several months before the crime and that the victim and the Petitioner seemed happy together. Ms. Latham never heard of her grandparents abusing the Petitioner.

Billy Ace Latham, the Petitioner's maternal uncle, testified that his family was poor and that he was raised by his grandparents. He said that his father was married to a woman other than his mother and that his father never acknowledged him as a son. He recalled an incident when the Petitioner's father shot at the Petitioner's mother. According to Latham, after the Petitioner was born, the Petitioner's father spent time in prison for bigamy.

Arbutus Norton testified that she became romantically involved with the Petitioner in 1994 while he was incarcerated. Upon the Petitioner's release, the two continued dating until the end of 1994, when the Petitioner ended the relationship in order to date other people. Ms. Norton never saw the Petitioner act badly while they dated. Ms. Norton was aware the victim

left the Petitioner. She said she had plans to visit the Petitioner the night of the crime. She said that the visit never occurred but that the Petitioner telephoned her after the murder and said, "I've done something stupid. If you want to know anything else call Mom."

Edythe Katie Helton testified that she taught the Petitioner in the third grade. She said the Suttles family "was more or less a clan unto themselves. A little bit poor economic situation." Although the teachers at the elementary school regularly visited the students' homes, her principal told Ms. Helton not to visit the Suttles home because she would not be welcome. She said the Petitioner enjoyed reading, was respectful, and followed directions well. She stated that the Petitioner appeared cleaner and nicer than the other Suttles children and that she had hoped he would be able to "break the economic substandard living and go on and become a useful citizen." She said the Suttles children were picked on by the other children at school because of their poor status in the community.

Wanda Ruth Corkey testified that her mother married the Petitioner's uncle, Charles W. Suttles, Sr., and that her stepfather's ex-wife and their children continued to live on the Suttles property. She said her stepfather "thought the world" of the Petitioner and treated him like his own son. She said that she was eleven years old when her mother married her stepfather and that her stepfather began sexually abusing her when she was twelve. She said she had two children by him. She said that she continued to live with her mother and stepfather because her stepfather threatened her and that she had nowhere else to go. She also recalled the incident when the Petitioner was left in her stepfather's car as a baby. As a result, the Petitioner's grandparents obtained custody of the Petitioner. She said the Petitioner was treated very well by his grandparents and even spoiled by them.

Ms. Corkey testified that the young girls in the family were not welcome in Noah and Dicie Suttles's home because Noah would expose himself to them. Ms. Corkey also heard that Noah molested some of the young boys in the family. She did not think, though, the Petitioner was ever sexually abused by any of his relatives. She described Playboy-like magazines containing the Petitioner's name and a female doll, which she remembered seeing in an abandoned building on the Suttles property. She said that the Petitioner's grandmother died in an automobile accident in 1980 and that the Petitioner was visibly upset at the loss and pushed his father away when his father tried to console him. At her stepfather's funeral in 1995, the Petitioner told Ms. Corkey that he was happy in his relationship with the victim.

Kathleen Suttles, another of the Petitioner's first cousins, testified that the Petitioner's parents were not around much when the Petitioner was growing up. She said her grandfather would expose himself and masturbate in front of the young girls in the family. Because of this, Ms. Suttles was forbidden to play in her grandparents' yard. She said the Petitioner was never sexually abused by any of his relatives.

26

The State called Barry Rice as a witness. Mr. Rice was the defense investigator in this case. He investigated the facts of the case but was not involved in gathering mitigation information. As part of his investigation, he interviewed the Petitioner's former employer and co-workers. The Petitioner worked for Tinsley Roofing after his release from prison. Rice said the Petitioner started as part of the crew but eventually advanced to a foreman position, for which he was in charge of both personnel and material. He said he learned that the Petitioner's crew was one of the best and that the Petitioner and one of his co-workers, Danny Cagley, intended to start their own roofing business. Rice did not observe any evidence suggesting the Petitioner was mentally retarded or intellectually impaired.

Mr. Rice testified that the Petitioner said he drove home after he killed the victim but said he could not remember much else. Rice interviewed Danny Cagley, though, who said the Petitioner called him twice the night of the murder. In the first phone call between 6:00 and 7:00 p.m., the Petitioner told Cagley that he had cut the victim. In the second call, at 9:00 p.m. from a pay phone, the Petitioner said he thought he had killed her. Rice learned that the first phone call to Cagley was made from the home of the Petitioner's cousin, J. D. Lewelling. The Petitioner also called his mother from the Lewellings' house.

Mr. Rice testified that he interviewed J. D. Lewelling. Mr. Lewelling told him that the Petitioner thought he killed the victim. He said Lewelling told him the Petitioner asked to be taken to an ATM to withdraw money. According to what Rice learned during the interview, the Petitioner changed clothes at some point and asked Lewelling for a gun and some provisions in order to hide out in the "holler" for a few days. Lewelling, however, did not give the Petitioner a gun but told the Petitioner to leave his house. Rice said Lewelling described the Petitioner as being emotionally upset. Rice was also informed that the Petitioner washed blood off his hands and his pocket knife and commented that he would not go back to prison.

In rebuttal, the Petitioner recalled Dr. Brown. Dr. Brown, having listened to Barry Rice's testimony, concluded that the Petitioner's conduct after the murder was disorganized and that he seemed to be reacting to what happened rather than planning a cover-up. According to Dr. Brown, through the several phone calls he made to friends and family, the Petitioner experienced a "growing realization" of what he had done.

## Burden of Proof and Standard of Review on Appeal

The Petitioner's post-conviction petition is governed by the Post-Conviction Procedure Act. See T.C.A. §§ 40-30-101 to -122 (2010). To obtain post-conviction relief, the Petitioner must show that his conviction or sentence is void or voidable because of the abridgment of a constitutional right. See T.C.A. § 40-30-103. The Petitioner must establish

the factual allegations contained in his petition by clear and convincing evidence. See T.C.A. § 40-30-110(2)(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the trial court rules on the petition, its findings of fact are conclusive on appeal unless the evidence preponderates against them. Nichols v. State, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). The Petitioner has the burden of establishing that the evidence preponderates against the trial court's findings. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). This court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the trial court. Nichols, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the trial court. Id.

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns, 6 S.W.3d at 461. As such, the trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied by a presumption that the findings are correct unless the evidence preponderates against the findings. Fields, 40 S.W.3d at 458 (citing T. R. A. P. 13(d)). However, a trial court's conclusions of law are reviewed under a purely de novo standard, with no presumption of correctness. Id.

## Issues on Appeal

### I. Ineffective Assistance of Counsel

The Petitioner contends that he received the ineffective assistance of counsel during both the guilt and penalty stages of his trial. This court will review in order each instance of misconduct alleged in the Petitioner's brief.

In pertinent part, the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "'so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment.'" Gideon v. Wainwright, 372 U.S. 335, 340 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to the effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having

28

produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984); see Combs v. Coyle, 205 F.3d 269, 277 (6th Cir. 2000).

The United States Supreme Court adopted a two-prong test to evaluate a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687. The performance prong of the Strickland test requires a showing that counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." Id. at 690. "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Combs, 205 F.3d at 278 (quoting Strickland, 466 U.S. at 689).

Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, we note that criminal defendants are "not entitled to perfect representation, only constitutionally adequate representation." Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 655 n.38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." Id. at 785.

If the petitioner shows that counsel's representation fell below a reasonable standard, then he must satisfy the prejudice prong of the Strickland test by demonstrating "there is a

29

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (citing Strickland, 466 U.S. at 687). In other words, "a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the [petitioner] of a fair trial and called into question the reliability of the outcome." Nichols, 90 S.W.3d at 587. That is, "the evidence stemming from the failure to prepare a sound defense or [to] present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." Id. Moreover, when challenging a death sentence, the petitioner must show that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.'" Henley, 960 S.W.2d at 579-80 (quoting Strickland, 466 U.S. at 695).

**Investigation/Trial Preparation**

**A.**

The Petitioner contends that trial counsel failed to select appropriate experts, failed to supervise properly the experts they retained, and failed to provide the experts with the information necessary to evaluate the Petitioner. Initially, the Petitioner complains that Dr. Matthews had a conflict of interest due to the nature of his previous involvement with the Petitioner. The Petitioner argues that the purpose of Dr. Matthews's evaluations while the Petitioner was in prison was dramatically different than the purpose of his evaluation following the murder in this case. Relying in part upon Dr. Brown's assessment, the Petitioner asserts that counsel should have realized Dr. Matthews might have been biased. The Petitioner suggests the jury viewed Dr. Matthews "either as a failed prognosticator who played a large part in allowing a 'risky' prisoner on parole or as an accurate predictor of future violence."

The Petitioner disagrees with the trial court's conclusion that counsel was not deficient in their strategic decision to employ the services of Dr. Matthews. Apart from describing the nature of Dr. Matthews's previous evaluations of the Petitioner, however, the Petitioner merely states that the evidence does not support the post-conviction court's conclusion. As noted above, the Petitioner cites to Dr. Brown's testimony. The evidence

30

introduced at the evidentiary hearing, though, consisted of more than just the testimony of the Petitioner's post-conviction experts.

Trial counsel considered Dr. Matthews to be a strong witness for the defense. Counsel were aware Dr. Matthews's testimony would be a "two-edged sword." Dr. Matthews previously testified in several death penalty cases, and counsel believed the fact that he was a prosecution witness in two of those cases gained the defense favor with the jury. Although Dr. Matthews ultimately reversed his reservations toward the Petitioner's release on parole, defense counsel believed Dr. Matthews's knowledge of the Petitioner's mental and emotional makeup outweighed any negative impact associated with the Petitioner's release on parole. As Mr. Jeffress testified, Dr. Matthews knew the Petitioner and knew how the Petitioner could react in stressful situations. Dr. Matthews was also able to state unequivocally that the Petitioner could not have premeditated the killing of the victim in this case.

This court agrees with the post-conviction court's conclusion that trial counsel made a reasonably informed strategic decision to employ the services of Dr. Matthews. Dr. Matthews never voiced concern to the trial attorneys about any conflict of interest regarding his involvement in the Petitioner's first degree murder trial. Trial counsel weighed the negative impact that Dr. Matthews's prior prison evaluations may have had on the jury. Because Dr. Matthews was intimately more familiar with the Petitioner, though, and because his opinion about the Petitioner's mental state at the time of the murder was extremely favorable to the defense theory of the case, trial counsel decided the positive aspects of Dr. Matthews's testimony outweighed any negative implications regarding the Petitioner's previous incarceration. Dr. Brown testified that the purpose of Dr. Matthews's previous prison evaluations of the Petitioner conflicted with his pretrial evaluations in this case. Trial counsel, however, did not consider this to be a conflict. Dr. Matthews was able to present to the jury the information trial counsel wanted. The circumstances surrounding Dr. Matthews's previous evaluations of the Petitioner were known to the jury because the Petitioner had already testified. The Petitioner has not shown by clear and convincing evidence that Dr. Matthews's services as a defense expert represented a conflict of interest due to his previous relationship with the Petitioner.

The Petitioner also complains that trial counsel's performance was deficient because they failed to inform Dr. Matthews about either the results of the Luria-Nebraska Neurological Screening Test performed by Dr. Bursten or Dr. Gruber's suggestion that the Petitioner receive a neuropsychological evaluation. Similarly, the Petitioner argues that Dr. Matthews did not administer a sufficient number of neurological tests during his evaluation of the Petitioner.

Trial counsel testified about their relationship with the Petitioner, and both attorneys attested to the Petitioner's general ability to communicate and function effectively. Moreover, counsel denied witnessing any significant signs suggesting they should be concerned about the Petitioner's mental state. Counsel did investigate the Petitioner's apparent memory loss regarding the death of the victim, but the EEG results were negative, and their experts did not suggest any further testing.

Dr. Matthews was familiar with the Petitioner from his previous evaluations. Neither attorney testified that Dr. Matthews requested additional information or was not satisfied with counsel's preparation. Dr. Matthews did not testify at the post-conviction hearing regarding his testing procedure or diagnosis. The Petitioner's EEG results did not reveal any organic brain damage, and the Petitioner's post-conviction experts could not pinpoint any evidence of actual brain damage. Dr. Matthews evidently did not believe further neuropsychological testing was necessary. As the trial court stated, counsel cannot be faulted for Dr. Matthews's performance in this case. See Byron Lewis Black v. State, No. 01C01-9709-CR-00422, Davidson County, slip op. at 26 (Tenn. Crim. App. Apr. 8, 1999), app. denied (Tenn. Sep. 13, 1999) ("The attorneys are not guarantors of the validity of an expert's results."). We conclude that the Petitioner has failed to carry his burden of proof on this ground for relief.

The Petitioner also complains about trial counsel's handling of Dr. Bursten. Although Dr. Bursten was originally retained to evaluate the Petitioner before the trial, both attorneys testified that Dr. Bursten unilaterally terminated his services, telling them he believed the Petitioner was lying and malingering. During his post-conviction testimony, Dr. Bursten admitted he did not remember the Petitioner and had no independent memory of evaluating him.

The trial court was unpersuaded by Dr. Bursten's testimony as it related to the Petitioner's claim of ineffective assistance of counsel. As the trial court noted, Dr. Bursten testified he was unable to dispute trial counsel's explanation as to why his services terminated. On appeal, the Petitioner asks this court to reevaluate the testimony of Dr. Bursten and trial counsel. This court, however, may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the trial court. See Nichols, 90 S.W.3d at 586. The evidence does not preponderate against the trial court's finding. The Petitioner has failed to carry his burden of proof on his claim regarding trial counsel's handling of Dr. Bursten.

Counsel testified that they provided Dr. Bursten with all the information they had and relied upon him to conduct a psychiatric evaluation of the Petitioner. Dr. Bursten did not assert that counsel failed to provide him with the necessary guidance or information. After

Dr. Bursten refused to continue working with the Petitioner, trial counsel employed Dr. Matthews, whom they ultimately believed better benefitted the defense. This court concludes that the Petitioner's trial attorneys were not deficient in their dealings with Dr. Bursten.

## B.

The Petitioner contends that trial counsel did not fully understand his cognitive impairments before discussing with him his decision to testify at trial. As noted, counsel did not believe the Petitioner was truthful when he questioned whether the victim actually died as a result of his attack. The Petitioner asserts on appeal, however, that his memory loss after the attack was the result of his neurological deficits and blocked emotional memory. The Petitioner argues that trial counsel should have investigated further why the Petitioner did not remember the events after the attack. The Petitioner suggests counsel's disbelief, coupled with the Petitioner's refusal to accept the plea offer by the prosecutor, adversely affected counsel's relationship with him.

Initially, this court notes that the right to decide whether to testify at trial belongs to the defendant. Momon v. State, 18 S.W.3d 152, 161 (Tenn. 1999). The Petitioner did not testify at the post-conviction hearing concerning his decision. Despite trial counsel's advice against testifying, the Petitioner decided in the middle of trial that he would take the stand in his own defense. As the trial court held, counsel's performance cannot be deemed deficient simply because the Petitioner did not follow counsel's advice against testifying. See Vermilye v. State, 754 S.W.2d 82, 88 (Tenn. Crim. App. 1987).

Furthermore, the record does not support the Petitioner's assertion that his trial attorneys were unprepared to deal with his alleged memory loss when he took the stand. Trial counsel testified that they developed a good working relationship with the Petitioner. They said the Petitioner was able to communicate effectively with them. Counsel did not believe the Petitioner was truthful about his memory loss because the Petitioner was able to recall every detail leading up to the time of the murder. Nevertheless, counsel hired experts to evaluate the Petitioner's mental state. An EEG was performed, but because the results revealed no brain damage, their expert did not recommend further testing. Trial counsel testified they were untrained in the mental health field and relied upon the advice and opinions of their experts. We note that trial counsel said one of the defense experts questioned the Petitioner's lack of memory of events after the murder and eventually quit. Moreover, when asked about the Petitioner's claimed memory loss, Dr. Brown, one of the Petitioner's post-conviction experts, could not offer any valid explanation, instead saying it was a "clinical piece that's unresolved."

33

A criminal defense attorney "must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." Baxter v. Rose, 523 S.W.2d 930, 933 (Tenn. 1975). Trial counsel thoroughly investigated the facts of this case. According to counsel, there were "abundant indications" the Petitioner was not mentally retarded. When the Petitioner informed counsel he could not remember what happened after the attack, counsel sought the advice of their expert. Their expert did not recommend further testing. We will not deem counsel ineffective for failing to pursue the matter. See Farris Genner Morris, Jr. v. State, No. W2005-00426-CCA-R3-PD, Madison County, slip op. at 59 (Tenn. Crim. App. Oct. 10, 2006) ("We cannot find trial counsel deficient for relying upon the pre-trial evaluation finding the Petitioner competent and sane."), app. denied (Tenn. Feb. 26, 2007); Glen Bernard Mann v. State, No. W2002-00260-CCA-R3-PD, Dyer County, slip op. at 33 (Tenn. Crim. App. Oct. 9. 2003) ("counsel's decision not to pursue [I.Q.] angle was reasonable based on his reliance upon Dr. Blair's recommendation"), app. denied (Tenn. Mar. 8, 2004). Counsel was somewhat surprised when the Petitioner decided in the middle of trial that he wanted to testify. Counsel had one night to prepare him for his testimony. Contrary to the Petitioner's argument, the record does not reveal that counsel were deficient in this respect.

The Petitioner has failed to explain how counsel's conduct resulted in prejudice during the guilt phase of the trial. The Petitioner notes the State's argument at trial that "it was clear that [the Petitioner] was lying about not remembering things" because of the telephone conversations the Petitioner had with various individuals after he attacked the victim. He relies upon Dr. Brown's assessment that his behavior after the murder was extremely disorganized. Such an assessment, however, would not have discredited the actual content of those telephone conversations relayed to the jury. Moreover, Dr. Brown's conclusion that the Petitioner's memory loss was a "clinical piece that's unresolved" would not likely have gained the Petitioner any favor with the jury. Nevertheless, had the Petitioner not testified in his own defense, the evidence of guilt was otherwise overwhelmingly sufficient to support the jury's verdict. The Petitioner is not entitled to relief on this particular claim of ineffective assistance of counsel.

## Guilt Phase

### C.

The Petitioner contends that trial counsel did not adequately present their guilt phase defense, which consisted of challenging the element of premeditation. The Petitioner argues that trial counsel's failure to investigate his cognitive impairments more thoroughly resulted in an inadequate defense. The Petitioner introduced the testimony of Drs. Auble and Brown as experts during the post-conviction hearing.

34

The trial court concluded that trial counsel's presentation of their defense to the charge of premeditated first degree murder was not deficient and that there was no resulting prejudice. Reviewing courts must indulge a strong presumption that the conduct of trial counsel falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689. Deference will be paid to sound trial strategy that is based upon adequate preparation. Hellard, 629 S.W.2d at 9. Our supreme court has stated:

> "Hindsight can always be utilized by those not in the fray so as to cast doubt on trial tactics a lawyer has used. Trial counsel's strategy will vary even among the most skilled lawyers. When that judgment exercised turns out to be wrong or even poorly advised, this fact alone cannot support a belated claim of ineffective counsel."

Id. (quoting Robinson v. United States, 448 F.2d 1255, 1256 (8th Cir. 1971)). "It cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics." Hellard, 629 S.W.2d at 9.

The Petitioner is essentially second-guessing the strategy of his trial attorneys. The Petitioner has not proffered any alternative theory of defense. An insanity defense was not viable at the time of the trial, and the Petitioner does not now suggest otherwise. After the Petitioner declined the State's plea offer, trial counsel knew the only defense was to attempt to negate the element of premeditation. Trial counsel did not observe anything during their relationship with the Petitioner to suggest that he was mentally disabled. To the contrary, counsel testified about the Petitioner's general ability to interact normally and assist with his defense. Although harboring doubts about the Petitioner's claim of not remembering the events after the murder, counsel had the Petitioner evaluated by several experts. According to counsel, though, one of the defense experts did not believe the Petitioner's claim of memory loss and terminated his relationship with them. Nevertheless, counsel testified they were fortunate to secure the services of Dr. Matthews, especially because he was able to tell the jury exactly what counsel wanted them to hear. The Petitioner has not shown that counsel's pretrial investigation into their only viable defense was inadequate. The record reveals the opposite.

Drs. Auble and Brown both testified that they diagnosed the Petitioner with a cognitive disorder, which qualified as a recognized mental disease or defect. Neither expert, though, could confirm the existence of any actual brain damage, and neither expert could state that the Petitioner was mentally retarded under Tennessee's legal definition at the time. They offered similar explanations for the Petitioner's behavior the evening of the crime, and

35

they both ultimately confirmed what Dr. Matthews asserted regarding the Petitioner's inability to premeditate.

Dr. Matthews testified that the Petitioner did not premeditate his actions. Dr. Matthews informed the jury that the Petitioner was in a state of heightened emotional arousal during the attack and reacted impulsively to the situation. The evidence at trial portrayed the Petitioner "as someone who acts impulsively, without thought or reflection, and who, frightened of being alone, becomes anxious and potentially violent when unable to control his environment." Suttles, 30 S.W.3d at 258. The trial evidence also suggested that the Petitioner's behavior was attributable to the oxygen deprivation he suffered as a "blue baby" and to his abandonment as a child. Id. According to the post-conviction testimony of Dr. Brown, the Petitioner experienced an overwhelming sense of anxiety and was in a state of intense emotional distress at the time of the attack. Dr. Brown also discussed the Petitioner's birth and early childhood abandonment issues as they related to his actions the night of the crime. Similarly, Dr. Auble testified that the Petitioner tended to act impulsively in his pursuit of the women who terminated romantic relationships with him. Both experts ultimately stated that the Petitioner could not have premeditated his actions because of his emotional and mental state, which was the same opinion Dr. Matthews offered at trial.

The record reveals counsel offered evidence that the Petitioner reacted emotionally and impulsively to the events unfolding as opposed to acting with premeditation. The fact the Petitioner presented different experts in the post-conviction setting who were able to offer additional opinions in support of the same theory of defense does not mean trial counsel was ineffective in their trial presentation. Moreover, the jury's finding of premeditation does not mean trial counsel's presentation of their defense was ineffective under Strickland. As noted earlier, criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. Denton, 945 S.W.2d at 796. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

In any event, we conclude that the Petitioner did not demonstrate any resulting prejudice. As the supreme court held on direct appeal:

> [W]hether a killing is premeditated is a question of fact for the jury to decide. The jury was in a position to evaluate the testimony of both the defendant and Dr. Matthews in this case and obviously accredited the State's witnesses when it returned a verdict of guilty of first degree premeditated murder.

36

Suttles, 30 S.W.3d at 261. There is no reasonable probability that the jury would have decided otherwise if Drs. Auble and Brown testified at trial. As the supreme court emphasized, the eyewitness testimony describing the Petitioner's actions during the attack was powerful:

> The record reflects that the defendant grabbed the unarmed victim when she refused to go home with him and held a pocket knife to her throat. When the victim's daughter got out of the car and approached the couple, the defendant told her to "Get back or I'll kill her." After the victim told the defendant she would go with him, the defendant released her, closed the knife, and put it back into his pocket. When the victim then attempted to flee to the safety of the Taco Bell, the defendant chased her, tackled her, took out his knife, opened it, slashed her throat, and stabbed her several times while she lay helpless on the ground, and then, turned the victim over and stabbed her several more times. When the attack was over, the defendant got up, wiped the knife on his pants to remove the blood, then "nonchalantly" walked across the parking lot to his car, and drove out of the parking lot, smiling at the victim's daughter as he passed. Less than one hour after the assault, the defendant telephoned a friend and calmly described the assault, saying that he had cut the victim's throat and had stabbed her in the chest and in the back.

Id. The trial court did not err in denying relief on this basis.

**D.**

The Petitioner contends that trial counsel improperly allowed the jury to hear the facts and circumstances surrounding his prior convictions during his trial testimony. The Petitioner focuses on counsel's failure to request a jury-out hearing before the State's cross-examination.

Despite counsel's advice, the Petitioner decided to testify at trial. The prosecutor questioned the Petitioner during cross-examination about his prior convictions. After the prosecutor asked the Petitioner to identify the victims of the prior offenses, defense counsel requested a bench conference. Counsel stated: "I don't think it is timely to get into all this." Counsel also expressed concern that the prosecutor was referring to criminal offenses for which the Petitioner was not convicted. The trial court overruled the objection and allowed

the questioning to continue. Shortly after cross-examination resumed, counsel requested another bench conference when the prosecutor again referred to the wrong offenses. The trial court instructed the prosecutor to "lay it out correctly." The prosecutor then asked the Petitioner to confirm his conviction. Aside from the identification of the victims and the general nature of the encounter, the prosecutor did not elicit any further details of the previous criminal episode.

Counsel explained during the post-conviction hearing their theory of the defense:

> We just had to let it all, if you will, hang out. We really did because we thought that the best thing to do would be to let the jury know these things because it would indicate that . . . he was a . . . mad man at [the] time and that this was a – another incidence of the same thing, same type of conduct that would suggest that he did not – did not plan or did not premeditate this crime.

Counsel's goal in this case was to negate the premeditation element of the charged offense, and the circumstances of the prior crimes were essential to show the jury how the Petitioner reacted impulsively in these two similar situations when he was abandoned by female friends. We conclude that trial counsel's use of Dr. Matthews was not outside the wide range of professionally competent assistance. Dr. Matthews testified that the Petitioner could not have premeditated his actions. In addition to describing the Petitioner's background and emotional makeup, Dr. Matthews commented about the Petitioner's attacks on two separate women who abandoned him in order to explain the Petitioner's impulsive reactions in those situations. The defense goal was to show the jury the Petitioner was not generally a violent man, and the circumstances of his prior convictions supported Dr. Matthews's opinion.

The Petitioner suggests that trial counsel would not have voiced any objection during his testimony if counsel wanted the jury to learn about the circumstances of the prior crimes. Counsel objected, however, based on the timing of the evidence. Counsel knew the jury would eventually learn about the Petitioner's previous actions through Dr. Matthews's testimony later in the trial. The trial court correctly found that trial counsel cannot be deemed deficient for failing to request a jury-out hearing before the cross-examination of the Petitioner. Again, counsel's sound trial strategy will not be second-guessed.

As part of this argument, the Petitioner complains about trial counsel's decision to call his former parole officer to testify on his behalf. As counsel testified during the post-conviction hearing, they decided to have Gwen Stargil inform the jury that the victim was not afraid of the Petitioner. When questioned whether he was concerned about "opening the

door" to the circumstances of the previous offense, counsel explained that information would eventually be presented to the jury in connection with their theory of defense. Counsel's explanation for calling Ms. Stargil to testify was reasonable and will not be deemed deficient.

The Petitioner also argues that counsel did not take the appropriate measures to cure the prosecutor's suggestion that the prior conviction of felonious assault contained an element of premeditation. During cross-examination of Dr. Matthews, the following exchange occurred:

> Prosecutor: Well, he admitted, did he not, by pleading guilty to that offense that he premeditated?
>
> Dr. Matthews: He admitted to committing the offense. I don't know about premeditation.
>
> Prosecutor: Well, premeditation is an element of the offense.
>
> Dr. Matthews: That's what you say. I'm not sure.
>
> Prosecutor: Well, if he admitted premeditation shouldn't he know whether he premeditated or not?
>
> Dr. Matthews: I'm not, again, I don't know that he admitted premeditation.

Trial counsel voiced no objection during this line of questioning.

The Petitioner also complains about trial counsel's failure to object to the following statements during the prosecutor's closing argument:

> But you take to mind, keep in mind, when you consider what he says about not being able to premeditate at that time, that he was only intending to scare her, that the same psychologist testified that when [the Petitioner] pointed the gun at his former father-in-law and pulled the trigger, that that was only to scare him.

The Petitioner argues that the prosecutor's argument suggested the assault conviction was a premeditated offense.

During cross-examination, Dr. Matthews rejected the prosecutor's suggestion that the Petitioner admitted he acted with premeditation. Although the prosecutor misstated the elements of the assault offense, Dr. Matthews did not affirm that characterization. Further, the jury was instructed that the statements, argument, and remarks of the attorneys were not evidence. During the post-conviction hearing, trial counsel was not questioned about these two instances. The trial court did not err in finding that trial counsel's performance in these two instances did not fall below an objective standard of reasonableness or result in prejudice during the guilt phase of the trial.

**E.**

The Petitioner contends that counsel were ineffective because they failed to call two particular witnesses. The first, Jackie Alvin Davis, witnessed the murder. The Petitioner argues that Jackie Davis would have testified that the Petitioner held his knife in his hand during the entire attack and did not return it to his pocket. According to the Petitioner, Jackie Davis would also have testified that the Petitioner looked sad as he left the scene. The second, Arbutus Norton, was the Petitioner's former girlfriend. The Petitioner contends she would have testified that she and the Petitioner had plans to meet the night of the murder. According to the Petitioner, the testimony of these two witnesses would have helped negate the element of premeditation.

At the time of trial, Jackie Davis lived in Texas. Counsel did not subpoena him because they expected the State to call him as a witness. Counsel was surprised, though, when Mr. Davis was not called. Nevertheless, the Petitioner did not introduce Davis's testimony during the post-conviction hearing. The Petitioner bore the burden of presenting his testimony in support of this ground for relief. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The reviewing courts cannot "speculate or guess . . . what a witness's testimony might have been if introduced by defense counsel." Id. Because the Petitioner did not have Davis testify, he failed to demonstrate prejudice. See id. at 758.

Ms. Norton, however, testified at the post-conviction hearing that she and the Petitioner had plans to meet the night of the murder. The Petitioner argues that her testimony about their plans would have helped negate the element of premeditation. Norton's testimony may have been probative regarding whether the Petitioner had premeditated the murder at the time he and Norton made plans. However, such testimony would not have negated the Petitioner's forming premeditation after speaking with the victim or when he next saw the victim. Also, Norton testified that the Petitioner telephoned her after the attack and said, "I've done something stupid." If Norton testified at trial, the jury could have learned what the Petitioner told her on the telephone after he killed the victim. We conclude

40

that the Petitioner has failed to establish any resulting prejudice from counsel's failure to call Norton as a witness.

As the supreme court noted on direct appeal:

> '[P]remeditation' is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Suttles, 30 S.W.3d at 260-61 (quoting T.C.A. § 39-13-202(d)). The court also recounted several factors that tend to support the existence of premeditation: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." Id. at 261 (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)). In holding that the evidence was sufficient to support the conviction, the trial court noted the powerful eye witness testimony cited previously in this opinion and noted by the supreme court on direct appeal. See Suttles, 30 S.W.3d at 261. The supreme court also noted that the Petitioner "parked his car at a church one mile from his home in an apparent effort to conceal the crime" and that when the Petitioner "was taken into custody, he was described as 'unemotional' and 'indifferent.'" Id.

This proof showed that multiple factors supported the jury's finding of premeditation at the time of the murder, regardless of whether the proof showed premeditation before the Petitioner stopped at Taco Bell. See id. at 261-62. Given the nature of this evidence, trial counsel's failure to call Ms. Norton as a witness to testify about the Petitioner's and her plans to meet the night of the murder would not have discounted the evidence about premeditation already before the jury. The fact that the Petitioner had plans later that evening did not change his ability to reflect upon his actions after he encountered the victim at the Taco Bell. In fact, the jury had heard testimony about the Petitioner's previous plan to eat dinner with his mother that evening, which evidently did not sway the jury's decision. The Petitioner is not entitled to relief regarding counsel's representation in this respect.

41

**F.**

The Petitioner contends that counsel should have more thoroughly investigated the behavioral effects of the prescription drugs he claimed he ingested before committing the murder. Similarly, the Petitioner asserts counsel should have instructed Dr. Bursten to ask the Petitioner how the drugs affected him.

Approximately one week before the murder, the Petitioner was prescribed Paxil, an anti-depressant; Tranzene, a sleep aid; and Pepcid, an antacid. Ms. Shettles testified that the Petitioner reported he was taking more than the prescribed dosage before the time of the murder. Dr. Brown, the Petitioner's post-conviction expert, explained that the Petitioner reacted "catastrophically" to the drugs and said that at the time of the murder, the Petitioner lacked the ability to control or regulate his behavior due in part to the effects of the medication.

Trial counsel asked Dr. Bursten whether those prescription drugs could have played a role in the Petitioner's actions during the attack. According to counsel's testimony, Dr. Bursten assured them otherwise. Counsel testified that they relied upon this expert opinion and did not pursue the issue further. The Petitioner notes that Dr. Bursten testified that he did not remember the attorneys asking him whether the prescription drugs affected the Petitioner's behavior.

The Petitioner is required to establish by clear and convincing evidence the factual allegations in support of his claim. T.C.A. § 40-30-110(f). Furthermore, the credibility of witnesses and the weight and value to be afforded their testimony are questions resolved by the trial court. Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). The trial court found as follows regarding this ground for relief:

> This court finds that, after viewing all the evidence and the credibility of the witnesses, the evidence does not support any deficiency in performance at the time of trial related to the medications. Counsel identified the potential issue, provided the information to the appropriate expert, and then relied upon the appointed expert for relevant information. This court finds no fault in counsel for relying upon Dr. Bursten's opinion in an area in which he had been retained as an expert.

The Petitioner failed to carry his burden of proof on this issue. As this court has noted, the trial court did not find the testimony of Dr. Bursten credible. Nevertheless,

counsel's performance cannot be deemed deficient because they relied upon the advice of their expert.  See Farris Genner Morris, Jr., slip op. at 59; Glen Bernard Mann, slip op. at 33.

**Penalty Phase**

**G.**

The Petitioner contends that trial counsel should have objected to the State's introducing as an exhibit a copy of the indictment charging the Petitioner with the criminal offenses that resulted in his previous convictions.  The Petitioner pled guilty as charged to three counts of assault with attempt to commit first degree murder and one count of felonious assault.  The Petitioner cannot satisfy his claim of ineffective assistance of counsel in this instance.

Although counsel should have objected to the introduction of the indictment, the failure to do so did not prejudice the outcome.  See State v. Ivy, 188 S.W.3d 132, 153-55 (Tenn. 2006) (holding that the petitioner was not prejudiced in penalty phase of capital case when the prior indictment charging first degree murder was introduced but the defendant was convicted of second degree murder).  The Petitioner pled guilty to the charged offenses, and the judgments of conviction of those offenses, which were also introduced into evidence, supported the State's reliance upon the prior violent felony aggravating circumstance.  See T.C.A. 39-13-204(i)(2).  The Petitioner failed to establish a reasonable probability that the jury's sentence would have been different had the jury viewed only the judgment sheets but not the indictment.  This ground for relief is without merit.

**H.**

The Petitioner contends that trial counsel should not have introduced his entire prison record as mitigating evidence.  He argues that the prison records contained negative information that did not support the defense theory during sentencing.  The Petitioner refers to evidence of the facts and circumstances surrounding his prior convictions, including statements of the victims contained in the presentence report for the prior cases.  He also refers to unsubstantiated allegations of violence, including a previous sexual assault charge that was dismissed.

Counsel testified that their goal during the penalty phase was to portray the Petitioner as a generally nonviolent individual and to demonstrate to the jury how well he adapted to the structured prison environment.  Counsel believed the positive commendations of the prison officials contained in the records supported their theory that the Petitioner could function well in a controlled setting if the jury spared his life.  Counsel recognized that some

43

of the information contained in the records was not favorable. However, counsel's "theory was to let the good come in with what little bad there might be."

The Petitioner's prison records were introduced through the record custodian of Brushy Mountain Prison. During cross-examination, she acknowledged the records reflected the Petitioner's previous convictions, sentences, and parole date. She also stated the records contained twenty-nine letters from various prison staff members, including Associate Warden David Sexton, recommending the Petitioner for parole.

Warden Sexton testified on the Petitioner's behalf during sentencing. He said Petitioner's prison records reflected that the Petitioner received two minor disciplinary reprimands during his previous incarceration. He also said the records contained favorable recommendations for parole. The records documented the Petitioner's work history while he was in prison, and according to Warden Sexton, the Petitioner maintained various jobs without any problems during his incarceration. Warden Sexton also said there was nothing in the records that suggested the Petitioner was a violent prisoner.

During the State's cross-examination, Warden Sexton described two disciplinary reports contained in the records: (1) the Petitioner possessed a fan that did not contain an inmate identification tag, and (2) the Petitioner was found with several tools in his cell. Warden Sexton also read the letter he wrote recommending the Petitioner for parole. Warden Sexton acknowledged his previous belief that the Petitioner could make a good contribution to society if granted parole turned out to be wrong. He said, however, that his recommendation for parole was based upon the Petitioner's exemplary prison record.

During the State's closing argument, the prosecutor commented on the Petitioner's two prison disciplinary actions and suggested that "he didn't do well at all" in prison. Defense counsel emphasized the Petitioner's primarily favorable prison record during closing argument. Counsel argued to the jury that the Petitioner would spend the rest of his life in prison if they spared the death penalty, stating: "Dennis Suttles will never be free again, period."

In denying relief on the Petitioner's claim on this point, the trial court found "counsel strategically determined that the records should be submitted as a whole and that the good outweighed the bad." The court concluded that counsel's performance was not deficient in this respect and held that no prejudice resulted because the aggravating circumstances were "particularly strong."

As noted previously, deference must be given to an informed trial strategy. Hellard, 629 S.W.2d at 9. Trial counsel's conduct should not be measured in hindsight but should be

44

assessed from counsel's perspective at the time. Cooper, 847 S.W.2d at 528. Furthermore, the fact that a particular strategy failed or even hurt the defense does not, alone, support a claim of ineffective assistance of counsel. Id.

Contrary to the Petitioner's argument, defense counsel's explanation in support of their defense strategy during sentencing was not objectively unreasonable. Counsel wanted to show the jury how well the Petitioner conducted himself in prison. Counsel knew the jury was aware of the Petitioner's prior criminal record and the fact that he committed the instant crime while on parole. The Petitioner's prison records, however, revealed no acts of violence while the Petitioner was incarcerated. Attorney Davis testified: "I've been doing this a long time and I've never seen a series of prison records as complimentary."

Counsel realized they faced an uphill battle in the penalty phase because of the heinous nature of the murder and the fact that the victim's daughter witnessed the killing. In order to avoid the death penalty, counsel believed the best tactic was to demonstrate to the jury that the Petitioner could function well in a structured environment such as prison. As counsel testified, the Petitioner's prison records contained favorable documentation that supported their theory. Although there is reference to the Petitioner's prior convictions, including statements of the victims expressing fear of the Petitioner, the jury already knew the Petitioner committed previous acts of violence. The prosecution did not emphasize any specific part of the records during the sentencing hearing testimony or closing argument except that the Petitioner committed the prior violent felonies and that he committed the instant murder after he was released on parole, facts already known to the jury.

Although the Petitioner argues that the unfavorable information contained in the records did not relate to his behavior in prison and thus should not have been introduced, counsel testified that the theory was "to let the bad come in with the good." As counsel testified: "We got all these records in without objection from the DA or him asking for them. I think having all of these records come in in their entirety was more important than particulars of an offense to which he's already pled guilty." Moreover, counsel did not believe the information relating to the Petitioner's parole recommendation would be considered less favorably by the jury merely because the instant crime occurred while the Petitioner was on parole. According to counsel, the fact that the Petitioner committed the crime while on parole did not discount the Petitioner's model behavior while in prison, which was what they wanted to show the jury.

The prison records overwhelmingly indicate the Petitioner was a model prisoner, something the Petitioner does not dispute. Trial counsel in this case did not abandon their client's defense or fail to advocate against the death penalty as the Petitioner now suggests. Counsel was questioned about the documents contained in the prison records, which the

45

Petitioner suggests were unfavorable. Mr. Davis testified he thought the positive information relating to the Petitioner's life inside prison outweighed any negative effect the records showed about his life outside prison. The acts of violence to which the Petitioner's brief refers occurred outside the prison environment. The general tenor of that information was already before the jury. Again, the defense goal was to convince the jury the Petitioner did not act violently in prison.

We conclude that trial counsel's decision to introduce the prison records in their entirety was not objectively unreasonable. Again, the fact that a particular strategy failed does not, standing alone, support a claim of ineffective assistance of counsel. Regardless, had counsel redacted those parts the Petitioner now deems objectionable, the weight of the evidence proffered in support of the aggravating circumstances was substantial. The Petitioner has failed to demonstrate ineffective assistance of counsel in this respect.

Citing State v. Miller, 674 S.W.2d 279 (Tenn. 1984), the Petitioner argues that the reference in his prison records to a previously dismissed sexual assault charge was, standing alone, reversible error and cause for a new sentencing hearing. The Petitioner's argument is misplaced. In Miller, the supreme court held on direct appeal that admission of evidence of the defendant's arrest on two rape charges that were later dismissed amounted to reversible error and required a new sentencing hearing. Id. at 284. In the Petitioner's case, however, the State did not introduce the evidence. Moreover, the Petitioner is challenging his trial attorneys' representation in the post-conviction context. The Petitioner must still, therefore, establish both that the decision to introduce his prison records was deficient and that prejudice resulted from that decision. The information about the previous assault charge was only a part of the prison record, which counsel introduced in mitigation, and nothing about that information was highlighted to the jury by either party during sentencing or closing argument. This court has concluded that the Petitioner failed to demonstrate ineffective assistance regarding counsel's goal with respect to the prison records. The information about a criminal charge that was eventually dismissed does not, standing alone, warrant post-conviction relief.

## I.

The Petitioner contends that his trial attorneys were ineffective because they failed to maintain a working relationship with their mitigation specialist and failed to investigate the Petitioner's background adequately in order to obtain meaningful mitigation evidence. During the post-conviction hearing, the Petitioner introduced numerous witnesses who testified about the circumstances surrounding the Petitioner's upbringing. The Petitioner argues that this evidence about his childhood might have influenced the jury to return a sentence other than death.

46

The trial court concluded that counsel were not deficient in their investigation and presentation of the mitigation defense during sentencing. The court further concluded that the additional mitigating evidence introduced during the evidentiary hearing would not have changed the outcome of the sentencing verdict. When considering a claim that trial counsel failed to present sufficient mitigating evidence, our supreme court has directed the reviewing courts to consider the following: (1) the nature and extent of the mitigating evidence that was available but not presented; (2) whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings; and (3) whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. Goad v. State, 938 S.W.2d 363, 371 (Tenn. 1996).

Initially, this court notes that there was inconsistent testimony by Ms. Shettles and counsel concerning her role in this case. Shettles was hired by counsel as a mitigation specialist, despite counsel's urging the Petitioner to accept a plea offer. Counsel had used the services of Shettles in the past and instructed her to "do her usual job" in this case. The trial court accredited counsel's testimony that they did not point Shettles in a specific direction and that they relied upon her proven expertise to gather relevant evidence for sentencing. The trial court found no fault on the part of trial counsel for relying upon the expertise of their mitigation specialist. In Farris Genner Morris, Jr., this court rejected a similar claim by the petitioner that his trial attorneys failed to use the services of Shettles properly. The court found "no fault in counsel for failing to instruct Ms. Shettles as to how to perform her job in an area in which she is supposed to be an expert." Id., slip op. at 67. The post-conviction testimony in this case reveals counsel was in contact with Shettles and reviewed all the information she gathered. As the trial court noted, this is not a case where trial counsel failed to conduct any investigation into the Petitioner's background and social history.

In essence, the Petitioner argues that trial counsel should have developed a different strategy of mitigation. According to the Petitioner's argument, counsel should have placed more emphasis during sentencing on his chaotic and dysfunctional childhood. Counsel, however, testified that they considered it more important to demonstrate to the jury how well the Petitioner behaved in prison. Once convicted, the least onerous sentence the Petitioner could receive was life in prison. Based upon his own experiences, Mr. Jeffress did not believe information about the Petitioner's childhood would be as persuasive to the jury as the Petitioner's favorable prison record because the Petitioner was forty-five years old, lived independently, and maintained a responsible job.

In the context of capital cases, a defendant's background, character, and mental condition are significant. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal

acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). A defendant's constitutional right to present a vast array of personal information in mitigation during the sentencing phase, however, is distinct from the question of whether counsel's choice about what information to present to the jury was professionally reasonable. The basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the State and to present mitigating evidence on behalf of the defendant. Although there is no requirement that a defendant present mitigating evidence, counsel has the duty to investigate and prepare for both the guilt and the penalty phases. See Goad, 938 S.W.2d at 369-70; Zagorski v. State, 983 S.W.2d 654, 657-58 (Tenn. 1998).

Although counsel has no absolute duty to investigate particular facts or a certain line of defense, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. In determining whether counsel breached this duty, counsel's performance is reviewed "for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" Wiggins v. Smith, 539 U.S. 510, 523 (2003) (quoting Strickland, 466 U.S. at 688-89)). Counsel is not required to investigate "every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." Wiggins, 539 U.S. at 533. Nor is counsel required to interview every conceivable witness. See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). In other words, counsel's duty to investigate and prepare is not without limit. See id.

As the trial court noted, the jury learned about the Petitioner's background during the trial testimony of Dr. Matthews and the Petitioner's mother. Dr. Matthews testified about the Petitioner's breech birth, the death of his brother, the abandonment by his parents, and the fact that he was raised by his grandparents. The Petitioner's mother also testified about the Petitioner's breech birth, the abandonment by his father, and the fact that the Petitioner was raised by his grandparents. There is no requirement that counsel present cumulative evidence during sentencing. See Nichols, 90 S.W.3d at 601-02. Contrary to the Petitioner's assertion, the evidence introduced during the evidentiary hearing did not portray the Petitioner's childhood in so dim a light as he now suggests. The trial court offered the following comments on the proof:

> The majority of the proof offered at the post-conviction hearing on mitigation was proof that dealt with the petitioner's extended family. While petitioner offered proof at this hearing concerning his upbringing and his issue with abandonment,

these issues were also raised at the original trial. In addition, the family members, who testified at the post-conviction hearing, described the defendant as having had much better treatment than they had experienced growing up. The petitioner himself had described his childhood as better than most to Dr. Brown and Ms. Shettles. Dr. Brown opined that certain issues, such as problems with anxiety and depression and the potential for alcohol and drug abuse, had a significantly higher risk of occurring in the petitioner's family than in other families. Petitioner's cousins testified that their grandparents treated the petitioner much better than they treated the other grandchildren and that he had been spoiled by them. A former teacher also testified to the potential she had seen in the petitioner that she had not seen in the other Suttles' family children. Four of the petitioner's twenty-something cousins were mentally retarded but . . . the petitioner does not fall into the mentally retarded range. Some of his cousins also dealt with issues of mental health such as anxiety and depression just like the petitioner. Others also dealt with drug and alcohol abuse which the petitioner did not.

Based on the evidence, this court finds that the evidence presented demonstrated that the petitioner had actually led a charmed childhood in comparison to his various cousins and that he had wasted his opportunity to become a productive citizen. While many of his cousins had difficult childhoods and some mental health issues, none of the petitioner's family had committed one, much less two, extremely violent acts as the petitioner had. [Internal footnote: According to petitioner's exhibit 38, other than the petitioner, the only family members, of the petitioner's rather large family, alleged to have a history of violence are the petitioner's father and uncle Charles. Although Charles Suttles, Sr. had no apparent criminal history, he reportedly raped his stepdaughter Wanda and fathered two sons by her while married to Wanda's mother. The allegations of violence on the part of the petitioner's father are related to the time before the petitioner's birth, the petitioner's early childhood and the discord in his marriage to the petitioner's mother.] This court cannot conclude that this additional family

49

history and background would have changed the outcome of the trial or sentence.

> There was some evidence introduced at this hearing of the petitioner's alleged mistreatment by his parents. These allegations primarily come from pleadings in the petitioner's parents' divorce and incidents where the petitioner was allegedly left in his Uncle Charles' car by his parents. While counsel admitted to not having had all this information, this court finds that all these alleged incidents occurred when the petitioner was less than 19 months old and the petitioner himself has no recollection of the same. [Internal footnote: Although the petitioner did not testify at this hearing, the records demonstrate that the petitioner admitted he had no recollection of this.] Before the parents even divorced, the petitioner had gone to live with his paternal grandparents. As previously discussed, family members described how his paternal grandmother had loved and spoiled petitioner and there is no credible evidence of any abuse or mistreatment by his grandparents.

As the trial court stated, no evidence was introduced to suggest the Petitioner was aware of or even affected by those events. Moreover, the bulk of the post-conviction evidence showed the troubles experienced by the Petitioner's family members, not the Petitioner. As the Petitioner states in his brief on this issue, "The documentary evidence introduced helped paint a vivid portrait of the troubled lives of Dennis Suttles' relatives and significant risk factors in his genetic background." Again, despite all the evidence about the Petitioner's extended family, there was no direct proof that it affected the Petitioner. The Petitioner did not testify at the hearing, and by all accounts the Petitioner obtained gainful employment and developed an independent lifestyle apart from the alleged dysfunction of his extended family.

The Petitioner submits that the jury should have heard proof supporting the accusations that the Petitioner was sexually molested by his grandfather. There was some post-conviction evidence relating to the grandfather's inappropriate actions toward other members of the Petitioner's extended family. In order to obtain post-conviction relief on his claim of ineffective assistance of counsel, though, the Petitioner had the burden of establishing by clear and convincing evidence the factual allegations in support of the claim. The trial court concluded that the Petitioner did not do so:

50

A specific issue petitioner's counsel attempted to establish as undeveloped mitigation was whether the petitioner had been sexually abused as a child. The petitioner, himself, has always denied any such abuse. While many of the petitioner's cousins were reportedly sexually abused as children, no family member who testified had any personal knowledge of or had heard of any sexual abuse of the petitioner. Dr. Brown testified that certain parts of the petitioner's social history would support the "theory" that the petitioner had been the victim of sexual abuse as well. Dr. Brown admitted, however, that the only actual allegation of any sexual abuse of the petitioner was in an affidavit from one of the petitioner's cousins[.] The petitioner's own evidence, however, describes the affiant as having severe mental health problems and a criminal record for various offenses. In addition, the incident the affiant alleges happened was described as the petitioner and another cousin, both 9 to 10 years in age, grabbing their grandfather's erect penis when he was in bed and then the boys laughing about it. The affiant, who would have also been young at the time, also stated that he "assumed" the behavior had been invited. Under all the circumstances, this court finds that this affidavit completely lacks credibility and that the petitioner has failed to carry his burden on this issue.

As noted, the Petitioner did not testify at the post-conviction hearing. Although Dr. Brown hypothesized that the Petitioner's grandmother spoiled him either to compensate for the sexual abuse he endured or as a bribe to cover up the grandfather's inappropriate conduct, he relied on an affidavit of the Petitioner's cousin regarding the alleged sexual abuse. The trial court found that the affidavit was not credible. In addition, the Petitioner denied to Dr. Brown that he was sexually abused. The proof failed to establish that the Petitioner was sexually abused. This court agrees with the trial court that the Petitioner failed to carry his burden regarding counsel's failure to present available mitigating evidence of sexual abuse.

Despite Ms. Shettles's belief that counsel did not present sufficient mitigating evidence, this court must conduct an independent analysis of trial counsel's performance under the Strickland standard. This court has reviewed both the post-conviction proof and the evidence introduced at trial in light of the factors outlined in Goad. As noted earlier, the general tenor of the post-conviction testimony as it related to the Petitioner's individual background was relayed to the jury through the trial testimony of Dr. Matthews and the Petitioner's mother. The remaining mitigating evidence that the Petitioner asserts counsel

51

should have presented to the jury does not directly address the Petitioner's own personal character or background. Instead, the evidence describes the social history of the Petitioner's extended family. Moreover, the nature and strength of that evidence is not particularly great given the generally favorable treatment the Petitioner received as a child compared to that of his cousins. Finally, the evidence upon which the State relied in support of the aggravating circumstances was particularly strong.

This court concludes that trial counsel's presentation of its mitigation case was not deficient or otherwise unreasonable. Also, the record supports the trial court's conclusion concerning any resulting prejudice:

> Assuming this court had found counsel to have been deficient, this court finds that it cannot conclude that the evidence presented at the post-conviction hearing would have in any way affected the outcome of the trial or sentencing hearing. The evidence presented which specifically related to the petitioner rather than extended family is primarily cumulative to the evidence and issues presented at trial. The statutory aggravating circumstances in this case also carried great weight. This was not the petitioner's only act of violence. In fact, as agreed to by Dr. Brown, the circumstances of the petitioner's priors were very similar to this offense and there was no potential for drug interaction in the first offenses. In addition, the petitioner committed this murder in front of the victim's minor daughter. The victim was alive and conscious when all the wounds were inflicted. Evidence at trial established that she would have lived from 10-15 minutes before she bled to death. The victim had been yelling for her daughter to stay back. The victim had defensive wounds. There is clearly substantial evidence that the victim suffered physical and mental pain between the beginning of the attack and her death and that this established torture without question. The petitioner repeatedly stabbed the victim in the torso, the back and the neck. The evidence was also more than enough to establish that the physical abuse was "excessive" and beyond that necessary to produce death. Based upon all this, this court cannot find that the outcome of the petitioner's trial or sentence would have been different.

This court concludes that a reasonable probability does not exist that the evidence the Petitioner now proffers would have changed the result.

**J.**

The Petitioner contends that if his post-conviction experts had testified during the penalty stage, the jury's sentencing decision would have been different. Similar to his claim regarding the lay witnesses, the Petitioner argues that trial counsel were ineffective by failing to discover potentially helpful mitigating evidence regarding his mental state and background. Contrary to the Petitioner's argument, however, trial counsel investigated the Petitioner's mental state. Counsel had the Petitioner evaluated by several different mental health experts, one of whom testified on the Petitioner's behalf at trial. This court has previously determined that counsel's performance was not deficient.

The Petitioner is again second guessing trial counsel's mitigation strategy. As noted, trial counsel's decision to present a mitigation defense based upon the Petitioner's model prison behavior was not objectively unreasonable. Both attorneys believed the Petitioner's age and ability to hold a responsible job and to maintain a household overshadowed information about his childhood. They decided to present evidence about how well he behaved in custody because they thought that was the best option for obtaining a life sentence.

Nevertheless, Dr. Matthews had already testified during the guilt phase, and the jury was instructed it could consider as mitigation any evidence in his trial testimony. Dr. Brown testified that the chaotic environment in which the Petitioner was raised caused him difficulty later in life managing the anxiety he experienced in his relationships with loved ones. Dr. Auble also testified that the Petitioner had difficulty managing complex relationships and that he would, in an effort to repair a broken relationship, tend to overwhelm the woman in his pursuits and ultimately act out impulsively toward her. Contrary to the Petitioner's suggestion, both of these opinions are similar to Dr. Matthews's trial testimony that the Petitioner became anxious and violent when he was unable to control his environment and that this behavior was attributable to the lack of oxygen he suffered at birth and abandonment as a child. Those were also the two main themes of the opinions of Drs. Auble and Brown. Moreover, all three experts agreed the Petitioner did not have the capacity to premeditate his actions the night of the murder. The fact that Dr. Matthews did not testify during the sentencing stage did not discount the weight of his testimony during the guilt phase as mitigating evidence that was before the jury during sentencing.

We conclude that the trial court properly determined that the testimony of Drs. Brown and Auble would not have altered the outcome of the sentencing hearing. The Petitioner did

not meet the then-existing legal definition for mental retardation. Further, Dr. Brown's opinions about the alleged sexual abuse the Petitioner suffered were conjecture. Dr. Brown testified at the post-conviction hearing that prescribed medications diminished the Petitioner's ability to control his actions. Trial counsel were assured by their experts, though, that the side effects of those drugs would not have caused the Petitioner to act the way he did. Nevertheless, Dr. Matthews informed the jury that the Petitioner was in a heightened state of emotional agitation and that his conduct at the time of the murder was impulsive and explosive.

Given counsel's chosen mitigation strategy and considering the testimony of Dr. Matthews, the trial court properly concluded that trial counsel's failure to present the expert testimony introduced during the post-conviction hearing did not result in the ineffective assistance of counsel during sentencing.

In so holding, we have considered the Petitioner's supplemental authority, submitted in support of his argument that trial counsel rendered ineffective assistance during the penalty phase of the trial. See Sears v. Upton, – U.S. –, 130 S. Ct. 3259 (2010). In Sears, the United States Supreme Court held that the Georgia trial court failed to apply the proper prejudice analysis after it concluded that trial counsel's penalty phase investigation was constitutionally deficient. Id. at 3265-67. Although the state court found that the petitioner satisfied the performance prong of Stickland, it determined that it would have been impossible to know what effect a different mitigation theory would have had on the jury because trial counsel put forth a reasonable theory with supporting evidence. Id. at 3264. The Supreme Court found fault with the state court's conclusion that a reasonable mitigation theory, "in the abstract, . . . obviate[s] the need to analyze whether counsel's failure to conduct an adequate mitigation investigation" prejudiced the petitioner. Id. at 3265. The Court stated: "The 'reasonableness' of counsel's theory was, at this stage in the inquiry, beside the point: Sears might be prejudiced by his counsel's failures, whether his haphazard choice was reasonable or not." Id.

We conclude that the holding in Sears does not affect this case. The trial court here, unlike the trial court in Sears, did not find that counsel's performance was constitutionally deficient. To the contrary, the trial court found "that counsel was not deficient in their investigation and preparation of potential mitigating evidence for the petitioner's capital sentencing hearing." Also, although the trial court conducted a prejudice analysis in the alternative, the court applied the correct standards of review. See Strickland, 466 U.S. at 691; Goad, 938 S.W.2d at 371.

## K.

The Petitioner contends that trial counsel were ineffective by failing to challenge the instruction the trial court provided the jury on the heinous, atrocious, and cruel aggravating circumstance. The Petitioner acknowledges that his direct appeal challenged the sufficiency of the evidence in support of this aggravating circumstance. He now asserts that counsel should have mounted an attack on the circumstance itself. Our supreme court has repeatedly upheld the constitutionality of this aggravating circumstance. See, e.g., State v. Keen, 31 S.W.3d 196, 210-13 (Tenn. 2000). The Petitioner cannot satisfy an ineffective assistance claim on this ground. See Carpenter v. State, 126 S.W.3d 879, 887-88 (Tenn. 2004) ("When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim.").

## Appeal

## L.

The Petitioner also challenges counsel's representation in the direct appeal. The Petitioner's argument consists of the following statements:

> Petitioner's 1997 conviction and death sentence are invalid and should be vacated because he did not receive effective assistance of counsel on appeal, as required by or necessary to the enforcement of the 6th, 8th and 14th Amendments to the U.S. Const. and Art. I, §§ 6, 8, 9, 16, 17 and 19 of the Tenn. Const. Counsel were ineffective for failing to raise claims and/or raise claims in an adequate manner per the grounds as set forth herein in [the issues addressed above].

The Petitioner offers no argument or citation to the record to support the general statement regarding counsel's alleged shortcomings on appeal. This court notes, however, that the trial court correctly found that trial counsel's performance was not ineffective at trial with respect to these issues. The record does not show that a reasonable probability exists that the result would have been different if the claims about which the Petitioner complains had been raised in the direct appeal. We conclude that the Petitioner has failed to establish his claim of ineffective assistance of counsel during either the guilt or penalty phase of his trial.

## II. Constitutionality of the Death Penalty

Finally, the Petitioner advances several challenges against the death penalty. He contends that Tennessee's death penalty statute is unconstitutional, that execution by lethal injection is cruel and unusual punishment, that the sentence of death unconstitutionally infringes upon his right to life, and that the indictment returned by the grand jury is unconstitutional because it does not contain the aggravating circumstances relied upon by the State. To the extent that these challenges were addressed during the direct appeal, they have been previously determined. T.C.A. § 40-30-106(h) (2010); Suttles, 30 S.W.3d 252. Moreover, all of the challenges presented by the Petitioner have been rejected previously by our supreme court. See State v. Hester, 324 S.W.3d 1 (Tenn. 2010); State v. Schmeiderer, 319 S.W.3d 607 (Tenn. 2010); State v. Kiser, 284 S.W.3d 227 (Tenn. 2009); Nichols, 90 S.W.3d at 604; State v. Dellinger, 79 S.W.3d 459 (Tenn. 2002).

We note that Tennessee's lethal injection protocol was recently deemed unconstitutional by the Davidson County Chancery Court in an order granting declaratory judgment to two plaintiffs sentenced to the death penalty. See Stephen Michael West & Billy Ray Irick v. Gayle Ray, Tenn. Comm'r of Corr., No. 10-1675-I (Davidson Chanc. Ct. Nov. 22, 2010) (Order). Our supreme court subsequently directed the State to submit a revised lethal injection protocol to the chancery court, and after consideration of the revised protocol with application of the standards from the plurality opinion in Baze v. Rees, 553 U.S. 35 (2008), the chancery court held that Tennessee's revised lethal injection protocol is constitutional. See Stephen Michael West & Billy Ray Irick v. Derrick D. Schofield, Tenn. Comm'r of Corr., No. 10-1675-I (Davidson Chanc. Ct. Mar. 2, 2011) (Order). Moreover, we are bound on the record before us to our supreme court's holding on this issue. See Kiser, 284 S.W.3d at 275-76 (rejecting a challenge to the constitutionality of Tennessee's lethal injection protocol).

## Conclusion

In consideration of the foregoing and the record as a whole, we hold that the trial court properly determined that the Petitioner failed to prove by clear and convincing evidence the individual allegations contained in his petition for post-conviction relief, that the Petitioner received the effective assistance of counsel at all stages, and that the Petitioner's claims regarding the constitutionality of the death penalty and the procedures used in Tennessee were without merit. The judgment of the trial court is affirmed.

JOSEPH M. TIPTON, PRESIDING JUDGE